## THE PEOPLE v. CHARLES T. WRIGHT.

*Criminal law—Preliminary examination—Return of magistrate—
Qualification of juror—Homicide—Trial—Evidence—Stay
of proceedings—Sentence.*

1. Where an examining magistrate fails to certify in his return
that the respondent waived a preliminary examination, which
was the fact, the circuit court has power to order a further
return showing such waiver, and trial may be had upon the
information filed on the basis of the original return.

2. An elector of a township who removes to another township in
the same county less than 10 days prior to being summoned as
a juror under an order made pursuant to How. Stat. § 7580,
directing the sheriff to summon a certain number of persons
from among the neighboring citizens, having the qualifications
of jurors, to complete the panel, does not cease to be an
elector so as to disqualify him from serving as such juror.

3. In the absence of a contrary showing by the respondent, an
attorney appointed by the court to assist the prosecuting
attorney in the prosecution of a criminal case will be presumed
to be qualified to perform such duty.

4. Evidence of the character of the wounds upon the body of a person
whose killing by the respondent was a part of the same trans-
action which resulted in the death of another person, for whose
murder he is being tried, is admissible.

5. In such a case it is not error to permit the counsel for the
people to exhibit the clothing of the murdered men to the
jury, and comment upon the same in their arguments; it being
proper to show the circumstances under which the crime was
committed, and how near to each other the parties were at the
time of the killing, it being claimed that the clothing exhibited
some evidence of, such fact.

6. A request to instruct the jury that they could not convict
respondent of murder in the first or second degree, but only
of manslaughter, is held to have been properly refused.

7. Where, on the day of the conviction of a respondent of the
crime of murder, his counsel entered a motion for an order
arresting and staying judgment and sentence, for the reason
that the court was without jurisdiction to try the respondent
for the offense charged, as appeared by the records and files in

the cause, but without further specifying the grounds of the motion, which the counsel refused to do on the request of the court, the refusal of said order, and the immediate sentence of the respondent, cannot be assigned as error.

8. Error cannot be assigned upon the sentence of a respondent, upon conviction of murder in the first degree, to solitary confinement in the State prison for his *natural* life, the word "natural" being surplusage.

Error to Benzie.  (Aldrich, J.)  Argued November 12, 1891.  Decided December 21, 1891.

Respondent was convicted of murder in the first degree, and sentenced to State prison for life.  Conviction and judgment affirmed.  The facts are stated in the opinion.

*N. A. Parker* and *Thomas A. Wilson,* for respondent.

*A. A. Ellis,* Attorney General, and *George G. Covell,* Prosecuting Attorney, for the people.

LONG, J.  The respondent was convicted of murder in the first degree in the Benzie circuit court on April 30, 1890, and on the 1st day of May, 1890, was sentenced to the State prison at Jackson for life.

The information charged that the respondent killed one Frank E. Thurber, at Aral, in the township of Lake, Benzie county, August 10, 1889.  Upon the trial the killing was not denied by the respondent.  The circumstances surrounding the transaction, as claimed by the prosecution and shown by the evidence, were that the sheriff of that county, claiming to have made a levy upon certain saw-logs under a writ of attachment, sent his deputy, Neal A. Marshall, to Aral, to take charge of the logs, to see that they were not removed.  These logs were the property of the Otter Creek Lumber Company, which was carrying on a lumber business at Aral.  The respondent was president and manager of that company. Aral is a small settlement around the mill of the com-

pany, situate on Otter creek. A north and south high-
way crosses the creek above the mill. West of the high-
way and south of the creek a saw-mill, blacksmith shop,
and carpenter shop are situated. A part of the lumber
from the mill is piled upon each side of the highway
and in the highway south of the creek, leaving a road-
way in the highway between the lumber piles. North of
the creek and west of the highway are situated the com-
pany's store, its barns, etc., together with two or three
dwelling-houses. A highway crosses this north and south
highway from 20 to 30 rods north of the creek, extend-
ing east and west. East of the point where these roads
cross is an hotel. The bridge crossing Otter creek in the
highway is so situated that it can be removed, and this
is frequently done, for the passage of logs down the creek.
The logs in controversy were upon the bank of the creek,
above this bridge, at the time the deputy-sheriff went
there by direction of the sheriff to take possession. At
this time the respondent, as president of the company,
was in possession, and proceeding to roll the logs into
the creek.

It appears that the trouble originated in the following
manner: Some days previous to the 10th of August the
sheriff of the county attempted to make a levy upon these
logs by writ of attachment, and several days after the
levy he found it necessary to place some one in charge
of the logs, and so sent his deputy, Neal A. Marshall,
to take charge of them, and see that they were not
removed. The respondent caused a writ of replevin to
be issued out of the circuit court for that county to
regain possession from the officer. The writ was placed
in the hands of the coroner, and, the respondent failing to
give the bond required by the statute, the logs were
released. This was on the morning of the 10th of
August. Immediately thereafter the respondent armed

himself with a Marlin repeating rifle, and went to the roll-way with his men, for the purpose of forcibly taking possession of the logs, and rolling them into the creek. Deputy-sheriff Marshall came there soon after, and forbade the respondent and his men from removing the logs. The respondent said to him, "Don't you molest my men," and, being told by Marshall that he would, raised his gun, and pointed it towards Marshall, and said, "If you do, I will drop you." Something of a dispute arose between Marshall and the respondent at this time. A part of the men employed by the respondent were Indians. Marshall arrested one of the Indians, who was assisting in rolling the logs. The controversy was kept up from about 10 o'clock in the forenoon until noon, when Marshall went away. He returned in the afternoon, and then arrested two other men; but, being unable to prevent the rolling of the logs, Marshall said to his men, "Come up to the hotel; we cannot do anything with them;" and he and his men then went away. After the logs were rolled in, the company's men went to their work at the mill, and the respondent went to the barn, left his gun there, and then went to the company's store. He soon after returned to the barn, took the gun, went to the mill, and from there to the blacksmith shop. While in the blacksmith shop, Mr. Reed, the blacksmith, says he looked out of the window, and told respondent that some one was coming down the road. The respondent took his gun, which he had put into a corner of the shop, and said, "It is a good thing to have plenty of sand," and, if they interfered with him again, he would fix them. He then left the blacksmith shop, carrying his rifle, and went towards the lumber piles in the highway south of the creek.

Neal A. Marshall, the deputy-sheriff, after leaving the roll-way in the afternoon, went to the hotel on the east

and west highway, and between 2 and 3 o'clock, coming out of the hotel, met Frank E. Thurber. Thurber was a practicing physician, and had his medicine case with him at that time. This case he left in a house north of the creek, and accompanied Marshall to the north and south highway, and down that, crossing the bridge which spans Otter creek. At this time two men were engaged in replacing the bridge, and an Indian by the name of Pahmageesick, standing above the bridge, was engaged in pushing the logs down the stream. As Marshall and Thurber crossed the bridge the respondent came out from between the lumber piles into the public highway and met them. The three passed south of the bridge down the highway between the lumber piles. The testimony leaves it in some uncertainty as to what took place between the three at this time, but it does appear that after they had passed south some three or four rods Marshall and the respondent faced each other, and came together, and had a struggle for the possession of the rifle. In a few moments Marshall released his hold upon respondent, let go of the rifle, and backed away from him, and, when some eight or ten feet away, the respondent quickly threw up the muzzle of the rifle, and fired, when Marshall fell dead, being shot through the upper part of the body. At this time Thurber was in the rear, and a little to the left of the respondent. The respondent turned upon him, and a struggle took place between them for the possession of the rifle. In the struggle the two weaved back and forth, approaching the bridge, each having a hand-hold of the rifle and their other hands clasping each other. When near the bridge the respondent released his hold upon the rifle, reached to his hip-pocket, and drew therefrom a revolver, placed it to Thurber's head and fired, and then, quickly placing the revolver to Thurber's breast, fired again, instantly killing

him. The two men at the bridge, named McCormick
and Peck, witnessed a part of the affray between the
respondent and Marshall, saw the gun discharged and
Marshall fall, when they started away from the scene of
the conflict, but heard the other two shots by which
Thurber came to his death. The Indian, Pahmageesick,
claims to have witnessed the whole affray. Immediately
after Thurber was killed the respondent passed to the
bridge, and above it, and seeing Pahmageesick, asked
him if he had witnessed the shooting, and, being told
that he had, asked him to say nothing about it. The
respondent went from there to the store, and shortly
after sent another Indian, by the name of Lahala, for
Pahmageesick, and again requested him to say nothing
of the shooting. Soon after that respondent fled to the
woods.

The news of the shooting soon spread through the com-
munity; and that evening the prosecuting attorney of the
county and the deputy-sheriff with others arrived upon
the scene. The respondent was not to be found, and, it
being reported that the Indian Lahala knew of respond-
ent's place of concealment, steps were taken by the pros-
ecuting attorney and deputy-sheriff to compel Lahala to
disclose his whereabouts, and to that end a rope was pro-
cured, a noose put around Lahala's neck, and the other
end of the rope thrown over the limb of a tree, and
Lahala suspended. The parties were not able to find the
whereabouts of the respondent by these means, and the
operations ceased. During the evening of that day the
respondent came from the woods and surrendered himself
to the officers, and was at once taken to Frankfort, the
county-seat, and placed in jail.

The trial came on before a jury, lasting nearly three
weeks, and was concluded on April 30, 1890. The infor-
mation charged murder in the first degree. Before the

impaneling of the jury, and at the time the respondent was arraigned upon the information, and before pleading thereto, his counsel moved to quash the information, on the grounds that the respondent had had no preliminary examination before the magistrate, and that the return of the magistrate did not show that respondent had waived examination. The prosecuting attorney thereupon asked an order from the court directing the magistrate to make further return. A further return was made by the magistrate, who then certified that the respondent did waive examination upon the charge contained in the complaint and warrant, which had previously been returned to the circuit court. The court thereupon overruled respondent's motion to quash the information. This action on the part of the trial court is complained of by respondent's counsel, and error is assigned upon it.

It is contended in this Court that the circuit court had no jurisdiction to proceed under that information, and that the case falls within the principles laid down by this Court in *Turner v. People*, 33 Mich. 363, and *People v. Evans*, 72 Id. 387.

It is provided by How. Stat. § 9555, that,—

"No information shall be filed against any person for any offense until such person shall have had a preliminary examination therefor, as provided by law, before a justice of the peace or other examining magistrate or officer, unless such person shall waive his right to such examination."

The proceedings before the magistrate for the arrest and examination of offenders for such offenses as are not cognizable by justices of the peace are contained in chapter 332, How. Stat. This examination is necessary after arrest in such cases before any information can be filed against the accused, unless he shall waive such examination. *People v. McKinney*, 10 Mich. 93; *Yaner v. People*, 34 Id. 288; *Sneed v. People*, 38 Id. 248; *Stuart v.*

*People,* 42 Id. 257. The accused may, however, waive
such examination, and, upon such examination being
waived, and the return made by the magistrate to
that effect to the circuit court, the information may
properly be filed against the accused. *Washburn v.
People,* 10 Mich. 372; *People v. Jones,* 24 Id. 215. From
the return made by the magistrate upon the order of
the court in this case it appeared that the respondent,
when brought before the magistrate prior to the time
the information was filed, had waived his examination,
but the justice had failed and neglected *so to certify* in
his return of the proceedings had by and before him to
the circuit court. By his return, made under the order of
the court, the fact was made to appear that the respondent
did waive such examination, and the justice then certi-
fied that he had found in the proceedings before him
that "the offense charged in the complaint and warrant
had been committed, and that there was just cause to
suspect the said Charles T. Wright to have been guilty
thereof." These proceedings had all been had before the
justice, and these questions adjudicated, prior to the time
of the filing of the information, but the fact of the
waiver of the examination had not been certified to the cir-
cuit court at that time, though all the other proceedings in
the case had been so certified and filed in the circuit
court. Under these circumstances, the circuit court was
not in error, when the further return was exhibited to
it that such an adjudication had actually been had by
the magistrate prior to the time the information had
been tendered, in holding the information good, and
refusing to quash it upon the grounds stated by respond-
ent's counsel.

The case does not fall within the principles laid down
in the cases cited by respondent's counsel. In the case
of *Turner v. People,* 33 Mich. 363, the question raised

was whether the proceedings had before the justice were so defective that they could not be used as a basis for the information; and it was held that the information might be filed for an offense shown by the evidence taken before the magistrate to have been committed. It was also held in that case that it is not competent to charge in the information an offense for which no preliminary examination has been had or waived; and, to determine whether such an examination was had as to any specific offense charged in the information, recourse can be had only to the examination returned and filed in the circuit court.

In *People v. Evans*, 72 Mich. 387, it appeared that the justice before whom the examination was held had not stated in his return that any offense not triable by a justice of the peace had been committed; nor had said justice in said return stated that there was probable cause to believe the respondent guilty of the crime charged; but, on the contrary, the justice expressly declared that he did not believe that said offense had been committed, or that respondent was guilty thereof, and that he only required respondent to recognize to appear for trial in the circuit in deference to and by reason of the intense public feeling upon the subject against respondent. It was upon this return that the prosecuting attorney filed the information in that case, and it was held by this Court that the circuit court had no jurisdiction at the time of the filing of the information, and the proceedings were quashed.

In the present case, the return of all the proceedings, and his subsequent return, showing that the respondent had waived examination, had been made by the justice. The court therefore had jurisdiction at the time the information was filed.

The second ground of complaint relates to the question

·of the qualifications of one Myron D. Clary as a juror. It appears that there was not a sufficient number of jurors drawn to fill the panel for the trial of the cause who were qualified to sit. The court entered an order directing the sheriff to summon 48 additional persons qualified to sit as jurors from among the neighboring citizens to complete the panel. Mr. Clary was one of the persons so summoned. It is contended by counsel for respondent that Mr. Clary, upon his examination as to his qualifications to serve as a juror, disclosed the fact that his residence was in Clinton county, and not in Benzie county. The examination of the juror is fully set out in the record. We need not set forth at length these circumstances here, as we are satisfied from an examination of them that at the time Clary was summoned he had become a resident of Benzie county.

It appears that William H. Sabin, another juror, had long been a resident of the State, living for many years in Van Buren county. He had moved from Van Buren county to Nesson City, in the township of Colfax, Benzie county, some three and a half months prior to the time of being summoned as a juror. The week before being summoned he had moved up to Buckley & Douglas' railroad, out of Colfax township, and into another township in Benzie county. This did not disqualify him from serving as a juror. How. Stat. § 7580, provides that,—

"When there shall not be jurors enough present to form a panel in any cause, the circuit court may direct the sheriff or other proper officer to summon a sufficient number of persons having the qualifications of jurors to complete the panel from among the by-standers, or from among the neighboring citizens."

Section 7555 provides that jurors shall have the qualifications of electors. The juror Sabin was a citizen of the State, and a resident of Benzie county, where the trial was had, and an elector within the township of

Colfax, in that county; and when he moved from that township to another township, a few days prior to being summoned, he was among the neighboring citizens, and had not lost his qualifications as an elector by moving from one township to another, so as to deprive him of his qualifications as a juror.

Another alleged error is based upon the action of the court in appointing E. S. Pratt and Thomas Smurthwaite as counsel to assist the prosecuting attorney in the trial without requiring them to be sworn as to their qualifications as such counsel. It appears that the trial court regarded the case as one of great public importance, and at the request of the prosecuting attorney appointed these attorneys to assist him. During the trial no objection was made by respondent's counsel, and nothing called to the attention of the court by him or any other person which showed any disqualification in them to assist the prosecution, and nothing appeared during the trial which has been called to the attention of this Court showing any such disqualification. Upon the argument here something has been said by counsel that these attorneys, or one of them, was the attorney of record in the attachment proceedings under which Marshall was acting in attempting to hold the logs, and out of which the affray grew. The writ of attachment was not offered in evidence in the case, and there is nothing upon the record before us disclosing the fact. It is said by counsel for respondent in their brief that it was the duty of the court, before making the appointments, to examine these attorneys as to their qualifications to assist the prosecution. They were officers of the court, and the presumption is that they were qualified to take part in the case in behalf of the people. The respondent had the right to examine them to show them disqualified. It is not a question of waiver of any rights which the respondent had; it is a

question of the qualifications of these attorneys to act for the people; and, there being nothing to the contrary, it must be presumed, they being officers of the court, that they were not disqualified.

In *People v. Bussey*, 82 Mich. 49, it appeared that the prosecuting attorney was disqualified from acting, and it was held by this Court that he could not act, even with the unqualified consent of the respondent, for the statute forbids any attorney from prosecuting "any person for an alleged criminal offense where he is engaged or interested in any civil suit or proceeding depending upon the same state of facts against such person." The disqualification in that case was conceded and shown. In the present case no disqualification is shown. The court was not in error in permitting these attorneys to assist the prosecution, and it was not error to fail to require them to be sworn as to their qualifications.

Some claim is made that the prosecuting attorney was disqualified from acting in the case by reason of his taking part in the hanging up of the Indian Lahala, on the night of the murder, to compel him to disclose the whereabouts of the respondent. Perhaps the prosecuting attorney exhibited more zeal in ferreting out the crime and in attempting to discover the whereabouts of its perpetrator than was justifiable; but it must be remembered that a grave crime had been committed, and two men had lost their lives. It is not surprising that the people of that community were greatly excited, and that strong efforts were made to discover the criminal. Under the excitement of the occasion the prosecuting attorney and the other officers of the county would have been more than human had they not been actuated by the same spirit which moved others to discover the criminal. It can hardly be said that they attempted or intended to

take the life of Lahala, their motive being solely to make him confess the whereabouts of the respondent. The excitement incident to such an occasion has often led the good people of a community to take summary vengeance upon parties guilty of such grave offenses. These scenes are always to be regretted, and the community itself, when the excitement is over, regrets the excesses to which it has been carried, under the impulse of the hour, to have the criminal punished. I think the people of that community, after the respondent surrendered himself to the officers, acted with great moderation. No injury was done the respondent, and, while it is true that a brother of the deceased deputy-sheriff attempted to inflict injuries upon him, yet the prosecuting attorney and the other officers not only protected him from bodily harm, but lodged him safely in the county jail, to await the due process of the law. I fail to discover anything in the record which disqualified the prosecuting attorney from prosecuting the case. That he was zealous in the trial of the cause is made apparent by the record, but that he at any time in the discharge of his duty to the people during the progress of the trial exceeded the bounds of propriety, or failed to give the respondent that fair and impartial trial which the law guarantees, I am unable to discover in the record.

It is claimed that the court was in error in permitting witnesses to state the character of the wounds on the body of Marshall. There was no error in this. The killing of the two men was a part of one and the same transaction. All that took place there, all that was said and done, was competent to go to the jury in determining the guilt or innocence of the respondent and the degree of the crime of which he was accused.

Error is assigned upon the ruling of the court in per-

mitting counsel for the people to exhibit the clothing of Marshall and Thurber to the jury, and comment upon it in their arguments. There was no·error in this. Upon the trial it was shown, and not contradicted, but confessed, that these two men came to their death by the hand of the respondent. The circumstances under which the crime was committed were proper to be shown. It was proper to show how near to each other the parties were at the time the fatal shots were fired. The clothing, it is claimed, exhibited some evidence of this fact. There was no error in permitting the clothing to be examined, or in the remarks made by counsel upon it.

Error is assigned upon the language used by Mr. Pratt, one of the counsel for the prosecution, in his remarks to the jury upon the argument of the case, as follows:

"Extend the same mercy to the defendant as he did to Marshall when he stood appealing to him with hands up, and asked him not to shoot; also the same mercy that he extended to him, when he took his life in his own hands, and shot Thurber down. You should give the same mercy to him that he gave to his wife, whom he had taken unto himself, and who will carry that disgrace with her down unto death."

It is claimed on the part of the respondent that there is no testimony in the case that Marshall did appeal to respondent or ask him not to shoot; that the evidence tended to show that Marshall threw his hand around, as if in the act of reaching his hip-pocket, as the witnesses inferred, with the intention of getting a pistol. The theory of the defense is that the respondent was acting under the impulse of the moment, and in self-defense. There is one witness, however, who testified that Marshall raised his hand to his face or head, and it appears that something was said by Marshall at this time; but what it was none of the witnesses are able to state clearly. McCormick and Peck apparently became frightened dur-

ing the struggle between the respondent and Marshall,
and made haste to get out of the reach of the Marlin
rifle, should it be discharged, leaving Pahmageesick the
only eye-witness to the rest of the struggle.   It did
appear that Marshall had a pistol in his hip-pocket.
One was handed to him by the sheriff at the time of going
down to look after these logs.   But the record does not
purport to contain all the evidence given upon the trial,
and we cannot say that the statement made by Mr. Pratt
in his argument to the jury was not justified by the evi-
dence and the argument of counsel upon the other side.

Some questions are raised upon the conduct of the
prosecuting officers during the progress of the trial, and
upon the rulings of the court in the admission and rejec-
tion of evidence; but we do not deem them of sufficient
importance to need discussion.

At the close of the testimony counsel for respondent
requested the court in writing to give certain charges to
the jury.   In the second request it was asked that the
jury be directed that there was no evidence in the case
by which they would be warranted in finding a verdict
of guilty of murder in the first or second degree, and
that the greatest offense of which the respondent could
be convicted would be manslaughter.   The argument upon
this is that Marshall had procured the pistol some days
before the affray, which fact was communicated by Lahala
to the respondent; that during the day of the affray
Marshall had been at the roll-way, and forbidden respond-
ent's men rolling the logs into the creek, and had used
more or less force to prevent its being done; that the
respondent then had his gun, and the only use he made
of it was to intimidate Marshall by threatening to shoot;
that, when Marshall returned with Thurber, respondent
saw them in time to have used his gun had his purpose
been to kill either of them; that he made no effort to

do this, but, when first meeting them on the bridge, told them to keep off his premises; that this was the only remark that passed between the parties during the entire struggle that was understood, except the exclamation of Marshall after he was shot; that the gun carried by respondent belonged to himself, and that Marshall had no right to attempt to take it from him forcibly; that in the absence of any evidence explaining Marshall's purpose, and in view of the presumption of innocence that attends the respondent in a criminal trial, it must be presumed that Marshall made an unlawful attack upon him, which he had a right to resist, and, if Marshall made an attack without making any remarks, the respondent was justified in believing that it was with the intention of doing him bodily harm, since he had been informed that Marshall had a pistol upon his person; that there was evidence of excited talk between them, and that it must be presumed that Marshall made a statement which justified the respondent in the belief that his life was in danger; that when Marshall lost his hold of the gun, and sprang back, making a motion as if putting his right hand to his hip pocket, respondent was justified in believing that he intended to get the pistol to shoot him; that, under these circumstances, the court had no right to submit to the jury the question whether respondent was guilty of murder in the first degree, for, if the shooting of Marshall was not murder in the first degree, then the shooting of Thurber, under the evidence, could not have been, as under the undisputed facts, after the shooting of Marshall, Thurber rushed upon respondent, getting him by the shoulder, and at once began the struggle for the gun; that while the struggle was in progress Thurber was shot; that any one, situated as respondent was, would have believed, or would have been justified in believing, that Thurber made the attack with

the purpose of getting possession of the gun with hostile intentions towards respondent.

The court gave the jury proper instructions regarding the crime of murder in the first and second degrees and of manslaughter. The court also gave the proper instructions in reference to justifiable homicide. He then charged them further:

"If you believe from the evidence that the defendant, Charles T. Wright, did on the 10th day of August last kill Frank E. Thurber, and you further find that said Charles T. Wright was acting for his defense, according to the circumstances as they appeared to him, and that from those circumstances he believed he was in danger of death or great bodily harm, and that he tried such reasonable means as would naturally occur to a humane man to repel such an attack, he might resort to such means as he believed to be necessary for protection, and if such means resulted in the death of the assailant the homicide would be justifiable."

In his instructions to the jury as to the things necessary to be found in order to find the respondent guilty of murder, the court directed the jury as follows:

"If you find beyond a reasonable doubt that Charles T. Wright did shoot and kill Frank E. Thurber, in order for the respondent to avail himself of the defense that the taking of the life of another was in self-defense it must appear to the jury from the evidence that the killing was necessary, or that to a reasonable person, situated in the same position that he found himself, the killing would appear to be necessary, and that only such force as would appear to a reasonable person so situated to be sufficient to repel the attack was used. To justify a person in taking the life of another it must appear that his safety required him to do so or, when the danger was only apparent, and not actual, that he was assaulted by the deceased, and the assault by the deceased was of such a nature as to induce a reasonable and well-grounded belief that he was actually in danger of losing his life or suffering great bodily harm, or that he did in fact believe upon reasonable grounds that he was actually in danger of losing his life or suffering great bodily

injury, whether a forcible attack was actually intended by the party killed or not.

"If a forcible attempt is made, with a felonious intent, against the person or property of another, the person resisting is not obliged to retreat, but may pursue his adversary, if necessary, until he finds himself out of danger, reasonable apprehension being sufficient here as in all other cases. This rule only extends to felonies, and has no application to cases where mere trespass is threatened or about to be committed.

"If you find from the evidence beyond a reasonable doubt that the respondent, at the time and place specified, shot and killed the said Neal A. Marshall, and that such killing was felonious, under the rules I have given you, and you further find that said Frank E. Thurber then and there seized hold of respondent, either to restrain him from escape or to prevent any apparent injury to himself, but without any intent to assault or injure the respondent in any way or do him any bodily injury, and you further find beyond a reasonable doubt that in the struggle that followed the respondent shot and killed the said Thurber, then I charge you that such killing would be felonious, unless you also find the respondent had reason to believe and did believe that, when said Thurber seized hold of him, he, said Thurber, intended to assault, or injure him, and that it was necessary for him to kill said Thurber in order to save his own life, or to save himself from serious bodily injury.

"If you believe from the evidence beyond a reasonable doubt that prior to the seizing of the arm of the respondent by the deceased, Thurber, the respondent had formed the intention of feloniously and of his malice aforethought to take the life of the said deceased, Thurber, and you further believe beyond a reasonable doubt that from the conduct of the respondent the said Thurber believed that the respondent intended to take his life, and that, still having such malicious intent in his heart, the respondent did take the life of said Thurber, your verdict should be 'guilty of murder.' And if you find all of these circumstances to exist beyond a reasonable doubt, and you further believe that said Thurber resisted the respondent to the utmost, and that by such resistance the respondent believed, if he should fail in the preconceived purpose of taking the life of said deceased, Thurber, that he would be in danger of suffering great bodily injury or

losing his life by the efforts of said Thurber to resist
his attempt upon his life, he would not be justified in tak-
ing the life of the said Thurber, but would be guilty of
the crime of murder."

The court gave the jury certain rules to guide them
in arriving at their verdict and determining the degree
of the crime if they found the respondent guilty of any
offense, as follows:

"In order for you to find murder in the first degree,
you must find from all the evidence, beyond a reasona-
ble doubt, a deliberate intention to take the life of the
deceased, Thurber. While the law requires, in order to
constitute murder in the first degree, that the killing
shall be willful, deliberate, and premeditated, still it does
not require that the willful intent, premeditation, and
deliberation shall exist for any particular length of time
before the crime is committed. It is sufficient if there
was a malicious design and determination to kill, dis-
tinctly and deliberately formed in the mind at any time
before and continuing at the time the blow was struck.
If a person has actually formed a purpose maliciously
and willfully to kill, and has deliberated and premedi-
tated upon it before he performs the act, and then per-
forms it, he is then guilty of murder in the first degree,
however short the time may have been between the pur-
pose and its execution. It is not time that constitutes
the distinctive difference between murder of the first and
second degree. An unlawful killing with malice afore-
thought, willfully, with premeditation and deliberation,
constitute the crime of murder in the first degree; but
the term 'deliberate' is not applicable to any act done
on a sudden impulse.

"You cannot find the respondent guilty of murder in
the first degree unless you find from all the evidence,
beyond a reasonable doubt, that he did, on the 10th of
August, 1889, kill Frank E. Thurber, and that such
killing was with malice prepense or aforethought, and
also find beyond a reasonable doubt that such killing
was willful, deliberate, with a design to take the life of
said deceased. In order for you to convict the respond-
ent of murder in the first degree, the specific intent, as
well as all the other elements of the offense which I have
enumerated, must be affirmatively proved beyond a rea-

sonable doubt; that Charles T. Wright did shoot and kill the said Frank E. Thurber at the time and place specified, and that such killing was not excusable or justifiable under the instructions which I have already given you; that such killing was with malice prepense or aforethought; and if you fail to find beyond a reasonable doubt that such crime was perpetrated willfully, deliberately, and premeditatedly, your verdict will be murder in the second degree.

"If you find from the evidence beyond a reasonable doubt, that the respondent did kill the said Frank E. Thurber at the time and place specified, and you further find that the act of killing, even if you find that it was intentional, was committed under the influence of passion, or in the heat of blood, produced by adequate or reasonable provocation, and before a reasonable time had elapsed for the blood to cool and reason to resume its habitual control, and was the result of temporary excitement, by which the control of the reason was disturbed, rather than any wickedness of heart or cruelty or recklessness of disposition, then your verdict will be, 'guilty of manslaughter.'"

It needs but little argument to show the fallacy of the claim of the respondent's counsel "that there was no evidence to go to the jury warranting the conviction of murder in either degree." At the time Marshall was shot he was eight or ten feet away from the respondent. There was no evidence showing or tending to show that during the four or five days he was attempting to hold the logs he made any threat against the respondent to do him any harm; and it appeared that, finding the respondent determined to roll the logs into the creek, he went away peaceably, with the intention not to have any further controversy. He came back with Thurber, and was walking peaceably and quietly across this bridge, down between the lumber piles, in a public highway. The respondent met him and Thurber while carrying his Marlin repeating rifle, and with a revolver in his hip-pocket, and warned them not to come upon his premises. They were

not on his premises, but on the public highway. He accompanied them three or four rods along the highway, when for some reason not explained, except by the circumstances of the case, which tend strongly to show that he again threatened Marshall, they entered into a struggle for the possession of the gun, and, a moment afterwards, Marshall, springing away from him eight or ten feet, was instantly shot dead by respondent. There may have been something in these circumstances which might have justified a jury in returning a verdict for a lesser degree of crime in the shooting of Marshall than that of murder in the first degree, and yet the circumstances were such that a jury would have been justified in finding respondent guilty, in the shooting of Marshall, of murder in the first degree. But whether this be so or not, we think the testimony abundantly shows a premeditated and wicked intention on the part of the respondent to take the life of Thurber. While the struggle was going on between him and Thurber, he took the pistol from his pocket, and shot Thurber through the head. He was not satisfied with this, but at once placed the revolver to Thurber's breast, and fired again, causing his instant death. All the proper safeguards were thrown around the respondent by the court in his charge to the jury. They were told that, if the respondent believed he was in danger of great bodily harm from the hands of Thurber in the struggle for the possession of the rifle, he had a right to resort to such means as he believed to be necessary to his protection, and, if such means resulted in the death of Thurber, the homicide would be justifiable. This certainly went to the full extent that the respondent had a right to demand at the hands of the trial court.

The complaint is made that the court refused to give certain other requests of respondent's counsel in the

charge to the jury. We have carefully examined them, and find them so fully covered by the charge of the court as given that we shall not set them out here or refer to them further.

There is but one other question which need be noticed. The jury returned a verdict in the cause of murder in the first degree. This was April 30, 1890. On the same day respondent's counsel entered a motion for an order arresting and staying the judgment and sentence of the court on the verdict for the reason, as stated in the motion, as follows:

" That, as appears by the records and files of the cause, the said circuit court for the county of Benzie was without jurisdiction to try said defendant for the offense alleged against him in the information filed herein, which motion is based on the records and files of the case."

This motion was served upon the prosecuting attorney upon the day of its entry, with notice that it would be heard on May 6, 1890, at the opening of the court upon that day. This was called to the attention of the court May 1, and the court was asked to stay the sentence until the motion could be heard on the 6th of May. It was claimed by counsel for respondent that they wanted to examine some books which could not be found in Benzie county, and they wanted time for that. The court refused to stay the sentence, stating to counsel for respondent as follows:

"I asked last evening what would be the grounds of the motion, and the counsel did not see fit to give them. From the grounds of the motion that are given, it would seem apparent that, if any cause exists at the present time, it existed months ago. * * * It is now simply stated that this court has no jurisdiction. If the papers are all regular upon the face,—and nothing is alleged but what they are,—if the circuit court for this county has no jurisdiction, then no court on earth would have."

The court refused to stay the sentence, and sentenced respondent to the State prison at Jackson at hard labor for the term of his natural life.

Two questions are here presented under these proceedings:

1. That the court was in error in passing sentence upon respondent on the day following that upon which the jury returned their verdict, and after the motion had been entered to stay the sentence.

2. That the sentence is not in the form prescribed by statute, and is unknown to the law.

There is no error in this proceeding. The statute (section 9613) provides for the sentence of any person convicted in any court of record in this State. Chapter 335, How. Stat., provides for new trials and exceptions in criminal cases. Section 9577 of that chapter reads:

"Any person who shall be convicted of any offense before any court of record, considering himself aggrieved by any opinion, direction, or judgment of the court in any matter of law, may allege exceptions to such opinion, direction, or judgment, which exceptions, being reduced to writing in a summary mode, and presented to the judge before the end of the term, and found conformable to the truth of the case, shall be allowed and signed by the judge."

Section 9578 provides that—

"Upon the signing of such exceptions all further proceedings in that court shall be stayed, unless it shall clearly appear to the judge that such exceptions are frivolous, immaterial, or intended only for delay, and in that case judgment may be entered and sentence awarded in such manner as the court shall deem reasonable, notwithstanding the allowance of such exceptions."

This statute providing that the defendant in a criminal case may allege exceptions, and reduce them to writing in a summary mode, and present them to the judge before the end of the term, was held by this Court in the case of *Crofoot v. People*, 19 Mich. 254, to be direct-

ory merely, Mr. Justice CAMPBELL in that case holding the statute not only directory, but that it did not operate in arrest of judgment, and saying: "The court can still go on and sentence, if it is thought proper." It is evident in the present case that the trial judge regarded the motion as frivolous. It was near the end of the court, and we think it a matter entirely within his discretion to stay the proceedings until the motion was heard and exceptions settled, or to proceed to sentence if he believed the motion frivolous or made for the purpose of delay. When counsel for respondent was asked by the court to indicate or state the grounds of his motion and the reason why the circuit court had no jurisdiction to sentence him, he refused and neglected to state the grounds, and the court may well have said, under these circumstances, that the motion was for delay merely.

Under the second point raised, the only difficulty with the sentence claimed is that the court used the word "natural" before "life" in pronouncing it. The statute (section 9075) provides that, upon conviction of murder in the first degree, the person "shall be punished by solitary confinement at hard labor in the State prison for life." The mere fact that the court used the word "natural" before "life," in this connection could have no effect upon the sentence. The sentence as given is in compliance with the statute, the word "natural" being mere surplusage. It is not a restriction or limitation upon the word "life," affecting the meaning implied by the statute.

The conviction is affirmed.

The other Justices concurred.