### STATE v. CANO.

No. 4105.    Decided July 11, 1924.    Rehearing denied August 29, 1924.    (228 Pac. 563.)

1. CRIMINAL LAW—DEFENDANT HELD TO HAVE BEEN ACCORDED A PROPER PRELIMINARY HEARING IN MURDER PROSECUTION. Where defendant, on preliminary hearing on charge of murder, was, in fact, advised of his right to counsel, and offered a postponement to enable him to procure counsel, as required by Comp. Laws 1917, §§ 8737 and 8738, the failure of the magistrate's record of his proceedings to so show did not amount to a denial of a preliminary hearing.[1]

2. INDICTMENT AND INFORMATION—AFFIDAVITS HELD PROPERLY ADMITTED TO SHOW DEFENDANT RECEIVED PRELIMINARY HEARING. In a murder prosecution, court did not err, upon defendant's motion to quash information because he had been denied a preliminary hearing, in admitting affidavits of magistrate, county attorney, and stenographer to show that defendant was accorded a proper preliminary hearing; no prejudice resulting to defendant thereby.

3. CRIMINAL LAW—JUSTICE'S DOCKET RECITALS MERELY PRIMA FACIE EVIDENCE. Comp. Laws 1917, § 7531, providing that justice's docket entries or transcripts thereof, when certified, are prima facie evidence of the facts so stated, applies to criminal proceedings.

4. CRIMINAL LAW—APPOINTMENT OF INTERPRETER ON PRELIMINARY HEARING HELD DISCRETIONARY. In a murder prosecution, where magistrate proceeded at preliminary hearing without appointing an interpreter, evidence *held* to show defendant was sufficiently conversant with English language to make such appointment a matter of discretion, especially where defendant was not misled to his prejudice by anything he said or did prior to or at preliminary hearing.

5. CRIMINAL LAW—REQUIRING DEFENDANT TO SUBMIT TO PRELIMINARY HEARING ON DAY OF ARREST HELD NOT ERRONEOUS. In a murder prosecution, that defendant was required to submit to a preliminary hearing upon same day that he was arrested did not constitute error, in view of Comp. Laws 1917, § 8738; no specific time being required to elapse before preliminary hearing.

[1] *State* v. *Jensen*, 34 Utah, 166, 96 Pac. 1085; *State* v. *Hoben*, 36 Utah, 186, 102 Pac. 1000.

6. CRIMINAL LAW—CONTINUANCE HELD PROPERLY DENIED IN MURDER PROSECUTION, WHERE DEFENDANT NOT PREJUDICED BY SPEEDY TRIAL. In a murder prosecution, court did not err in denying continuance, though time between preliminary hearing and trial was only a little more than 30 days, where there was no undue public excitement or prejudice against defendant, and defendant secured every witness that he desired, and state produced every witness who knew anything about case, whether for or against defendant.

7. CRIMINAL LAW—GRANTING OF CONTINUANCE RESTS WITHIN TRIAL COURT'S DISCRETION. Whether a continuance should be granted in a criminal case rests largely within discretion of trial court.[2]

8. CRIMINAL LAW—MOTION FOR CHANGE OF VENUE IS ADDRESSED TO SOUND DISCRETION OF TRIAL COURT. A motion for change of venue is addressed to sound discretion of trial court, and, unless it appears that court abused its discretion, appellate court may not interfere.[3]

9. CRIMINAL LAW—WHETHER JURY IN MURDER PROSECUTION ALLOWED TO SEPARATE MATTER FOR TRIAL COURT. In a murder prosecution, that court allowed jury to separate during trial did not constitute error; such question being for trial court to determine, especially where no prejudice was shown.[4]

10. CRIMINAL LAW—DENIAL OF DEFENDANT'S CHALLENGE TO JURORS FOR CAUSE IN MURDER PROSECUTION HELD NOT PREJUDICIAL. In a murder prosecution, court's denial of defendant's challenge to several jurors for cause was not prejudicial, where all the objectionable jurors were eliminated from panel, and did not sit in trial of the case.

On Application for Rehearing.

11. CRIMINAL LAW—CHANGE OF VENUE HELD PROPERLY DENIED IN A MURDER PROSECUTION. In a murder prosecution, court did not err in denying a change of venue, where none of the jurors who tried case lived in town or vicinity where crime was committed, and not one of them was challenged for cause, nor did

[2] *State* v. *Anselmo*, 46 Utah, 137, 148 Pac. 1071.

[3] *State* v. *Carrington*, 15 Utah, 480, 50 Pac. 526; *State* v. *Haworth*, 24 Utah, 398, 68 Pac. 155.

[4] *People* v. *Callaghan*, 4 Utah, 49, 6 Pac. 49; *State* v. *Crerar*, 60 Utah, 208, 207 Pac. 597.

See 16 C. J. §§ 306, 307, 571, 592 (1926 Anno), 628 (1926 Anno), § 631, § 874, § 2527; 17 C. J. §§ 3577, 3633; 31 C. J. § 393.

defendant exhaust full number of his peremptory challenges, and though newspapers that circulated in that community denounced crime and perpetrator, they also circulated in practically all other counties of the state.

Appeal from District Court, Third District, Summit County; *G. A. Iverson,* Judge

Pedro Cano was convicted of murder, and he appeals.

AFFIRMED.

*P. H. Neeley,* of Coalville, and *John F. Tobin,* of Salt Lake City, for appellant.

*Harvey H. Cluff,* Atty. Gen., and *W. Hal Farr,* Asst. Atty. Gen., for the State.

FRICK, J.

Pedro Cano, hereinafter called defendant, was convicted of the crime of murder in the first degree. The jury having failed to recommend a lesser punishment, under our statute the district court of Summit county entered judgment that he be executed from which judgment he appeals.

The evidence adduced at the trial on behalf of the state disclosed the following facts:

The defendant is a Mexican, who at the time of the alleged offense had been in this country for about 9 years. During that time he had been employed as a common laborer in various occupations and had also been employed as a foreman by a sugar company in "fluming" sugar beets, and as a beet raiser on shares as a tenant of said company. He, it seems, had also worked as a miner in some of our metal mines. To what extent is not made to appear. While he spoke and understood the English language sufficiently to get along in doing his work, he nevertheless did not speak it fluently, nor did he fully understand many of the words or terms that are commonly used in court proceedings.

On the night of March 14, 1923, the defendant played cards with one of the state's witnesses until about 12 o'clock midnight, in a soft drink parlor in Park City, which is one of the principal mining camps in this state. About 12:30 a. m. (March 15th) one of the state's witnesses, according to his testimony, saw the defendant knock at the front door of the house in which the deceased (a young woman) lived alone. At that time, the witness said, the defendant wore a large hat and a light-colored overcoat. He could not state the color of the hat. There was an electric street light about 10 feet from the corner of the house referred to, and the witness was about 50 feet from the defendant when he saw him knock at the door of the house which he immediately thereafter entered. The witness was in that vicinity at the time in question waiting for a girl, whom he said he expected to meet, and while waiting there he slowly walked a few paces further from the building. While he was at that place he heard the screams of a woman coming from the house in which the man dressed as aforesaid had just entered. Upon hearing the screams of the woman, the witness immediately went back to the front door of the house where he saw the man enter, but found the door locked. At that moment he saw another one of the state's witnesses coming out of the house next to the one in which the screams were heard, and which house was only a few feet away from the house from which the screams emanated. The latter witness also testified that he heard the screams, and, as he says, wanted to "help" the woman. He tried to enter the front door, but could not, and he returned to the house from which he had just come and obtained a hand ax or some other tool with which he attempted to force an entrance through the front window of the house in which the deceased was, and from which he heard the screams, but in doing so broke some of the glass and made considerable noise. While this witness was attempting to force an entrance into the house, the first witness referred to saw the man, whom he had seen enter through the front door, emerge from a side window of the house into which he had entered. The man who came out through the window, however, was without a hat or overcoat,

and after emerging from the window he ran in the direction where the defendant had a room, in which he had stayed for about 2 weeks prior thereto, and where he, in a very short time after the incidents just stated, was found and arrested by the officers.

Immediately after the person had emerged from the rear window, as just stated, the second witness had forced an entrance into the building where the screams were heard, and he found a woman lying upon her side on the floor, with her head in her hand, gasping for breath, and in a moment thereafter she fell forward with her face downward on the floor. The witness immediately called for a doctor, and in a few minutes thereafter a doctor arrived. The doctor states that he arrived at 12:45 a. m. and found the woman lying face downward on the floor dead. He says she may have been dead not to exceed 15 minutes. The doctor turned the corpse over, and found that she had been stabbed in the breast with a knife all covered with blood which he found lying under the body. The deceased had been bleeding very "profusely." The doctor testified that the wound inflicted with the knife which he found as aforesaid had caused her death. The doctor also testified that he found evidence of violence, indicating that a struggle had taken place between the deceased and her assailant. For instance, the doctor found her jaw dislocated and various bruises on different parts of her body. The undertaker, who made an examination of the corpse at the post mortem thereafter held, also testified that there were "finger prints" on the throat of the deceased and other bruises upon different parts of her body. The hat, the state's witness testified, that the person wore that he saw knocking on the front door and entering the house of the deceased was found in the rear room of the house near the window from which said person emerged, and the overcoat was found on the floor, and the deceased was partly lying upon it. While the doctor was making the examination just stated, the officers appeared upon the scene, and were informed by the witnesses as to what they had seen and heard. There was much snow upon the ground at the

time, and the officers followed tracks in the snow from the window to the rear door of defendant's room. When the officers entered the room, they found the defendant without a hat or overcoat, and without shoes on his feet. He had a fire burning in a small stove, which fire had just been started, and water was on the stove. The defendant's hands were bloody, and he had more or less fresh blood on his clothes. When asked about the blood on his hands he said that he had been chopping kindling in the dark, and had hurt his hands, which caused them to bleed.

The defendant was forthwith arrested and was taken to jail. On the following morning the officers traced blood stains in the snow along the track from the window from which the man was 'seen to emerge to the rear door of defendant's room, a distance of 283 feet from the window. They at that time also took defendant's shoes and fitted them into the tracks left in the hard snow, where shoes had left an impression of about an inch in depth and defendant's shoes fitted the tracks perfectly.

There was a trunk in the front room, of the house in which the deceased had lived (the house being divided into two rooms), which trunk was open when the witnesses and the doctor entered, and which on examination, was found to contain $600 in express money orders and $425 in United States currency. It was also made to appear from the evidence that although the woman had lived in Park City for some time, she, nevertheless, was not generally known, and that she was, in all probability, a woman of the underworld. It also was made to appear that the defendant was seen wearing the hat and overcoat which were found in the rooms of the deceased, as before stated, at different times before the homicide. Moreover, the man who was seen entering the front door of the house as before detailed, was identified as being the defendant in this case. It was further made to appear that no one else was seen at or near the rooms of the deceased at or about the time the homicide occurred.

There are a number of other circumstances which the jury had a right to consider in determining defendant's guilt, to which it is not necessary to specifically refer.

The defendant testified in his own behalf, both directly and through an interpreter. He admitted playing cards until 12 o'clock on the night of the 14th of March, 1923, with one of the state's witnesses, and at which time he said he went to his room, where he was found as before stated. He said that he entered through the rear door, because some miner who went on shift to work about 11 o'clock that night, had locked the front door of the house where the defendant roomed with a padlock, to which the defendant did not have the key at the time. He also explained the blood on his hands as before stated, but the officers denied that the defendant had chopped kindling, or that there was any evidence that he had done so. The defendant also denied ownership of the hat and overcoat, and denied that he knew the deceased, or that he saw her on the night in question; and denied that he had stabbed her.

The defendant has assigned a large number of errors. The first one in order is that he was denied a preliminary hearing as contemplated by our statute. In view of this assignment it becomes necessary to state, somewhat in detail the proceedings leading up to and at the preliminary hearing. As before stated, the homicide was committed at about 12:30 a. m. of March 15, 1923. On the same day a coroner's inquest was held over the body of the deceased. A complaint was immediately filed against the defendant charging him with murder in the first degree, and a warrant for his arrest was duly issued, served and returned as required by law. After the return of the warrant with the defendant in court and with his consent, as will hereinafter appear, the preliminary hearing was set for 7:30 o'clock p. m. on the 15th of March. At that time the defendant again appeared before the magistrate.

It now becomes necessary to state the record of the proceedings had before the magistrate.

The record shows that on the 15th day of March, 1923, complaint was duly filed charging the defendant with the crime of murder in the first degree; that a warrant of arrest was duly issued and that the same was served and returned on the 15th day of March, 1923. The record then proceeds:

"The defendant, Pedro Cano, was present in court in person and not represented by attorney; complaint was read to said defendant, and defendant advised that he is charged with an offense over which this court has no jurisdiction to give a final trial; but that said defendant may have a preliminary hearing in this court; and, defendant being duly advised of all legal rights, a preliminary hearing was demanded, and the 15th day of March, 1923, at 7:30 o'clock p. m. was set for said preliminary hearing. The defendant was thereupon committed to the custody of the sheriff," etc.

The record then shows that subpoenas were issued for certain witnesses who testified on behalf of the state, and that a certain witness naming him, "testified on behalf of defendant." The record then concludes that, after hearing the evidence, the magistrate held the defendant to answer to the charge, etc. The defendant was accordingly held to appear before the district court of Summit county for trial, and an information in due form and in due time was filed in that court. The case was set for trial on the 4th day of April, 1923, and thereafter, on application of defendant's counsel, was continued to the 16th day of April, 1923. Trial was actually begun on the 17th and was concluded on the 21st day of April, 1923. The defendant had been duly arraigned in the presence of counsel appointed for him by the district court on the 19th day of April, and he, then being fully advised by his counsel, entered a plea of not guilty. In the meantime defendant employed additional counsel, who, before the commencement of the trial, asked leave to withdraw the plea of not guilty, which leave was granted, whereupon counsel interposed a general demurrer to the information and a motion to quash the same. Counsel did not argue the demurrer, but insisted that the information be quashed upon the ground that defendant had been denied a preliminary hearing as contemplated by our Constitution and statutes. The district court overruled the general demurrer, and denied the motion to quash the information. Counsel now insists that the district court erred in denying the defendant's motion to quash the information.

In support of this assignment, counsel in effect contends that the record of the preliminary hearing affirmatively

shows that the justice of the peace, before whom the preliminary hearing was held, did not comply with the provisions of our statutes relating to preliminary hearings and that, in contemplation of law, defendant was denied a preliminary hearing. It is also contended that the defendant was not given sufficient time to prepare for a preliminary hearing, and that he was not sufficiently advised respecting his legal rights before proceeding with the hearing.

Comp. Laws Utah 1917, §§ 8737, 8738, and 8739, relating to preliminary hearings, read as follows:

"8737. When the defendant shall be brought before the magistrate upon an arrest, either with or without a warrant, on a charge of having committed a public offense, the magistrate must immediately inform him of the charge against him, and of his right to the aid of counsel in every stage of the proceedings.

"8738. The magistrate must also allow the defendant a reasonable time to send for counsel, and postpone the examination for that purpose, and must, upon the request of the defendant, require a peace officer to take a message, to any counsel in the precinct or the city the defendant may name. The officer must, without delay and without fee, perform that duty.

"8739. At the time set for the hearing, the magistrate before whom the accused is brought must, unless a change of place of trial is had under the provisions of the next succeeding section, immediately after the appearance of counsel, or, if none appears, after waiting a reasonable time therefor, if the accused requires the aid of counsel, proceed to examine the case."

In section 8750 it is, among other things, provided that, in cases of homicide, the testimony of each witness must be reduced to writing, etc. It is, however, provided that the magistrate may appoint a stenographer, who may take the testimony of the several witnesses in shorthand, and afterwards transcribe his shorthand notes into longhand, and file the transcript, together with his shorthand notes, with the clerk of the court where the defendant is required to appear for trial. In this case the magistrate appointed a stenographer who took the testimony in shorthand and thereafter transcribed her notes as required by the statute, but did not file the transcript until the case was called for trial.

As before stated, defendant's counsel contends that the record of the proceedings before the magistrate does not

show that the defendant was given the information required
by section 8737, supra, and that the provisions of section 8738
were not complied with. When this contention was first ad-
vanced in the district court, the state's attorney, without
conceding that the record was defective, as urged by defend-
ant's counsel, nevertheless offered to show by affidavits of
the county attorney of Summit county who conducted the
preliminary hearing, the magistrate before whom the pre-
liminary hearing was held, and the stenographer who was
appointed to take and did take the testimony as aforesaid,
just what took place at the time the defendant was first
brought before the magistrate, and what took place and what
was said before the preliminary hearing was entered upon.
The magistrate, in his affidavit, among other things, testified:

"That prior to the defendant's arraignment, and before any
evidence was introduced, affiant informed defendant that defendant
was entitled to have a lawyer represent him at all stages of the
case, and that, if defendant wished to have the hearing postponed
for that or any other purpose, affiant would postpone it; that de-
fendant stated at said time that he did not want any attorney and
was ready to proceed; that defendant spoke English and apparently
understood the nature of the examination."

The affidavit of the county attorney fully corroborates the
statements of the magistrate, but goes a little more into de-
tail, in that the county attorney states that he had trans-
acted some business with the defendant before the commis-
sion of the alleged offense, and that the "defendant under-
stood and speaks the English language." The stenographer's
statements fully corroborate the statements of the magistrate
and the county attorney, and she further states that she was
not familiar with the conduct of preliminary hearings, and
she understood that she was only required to take the testi-
mony of the witnesses, and that was the reason why she did
not take down and transcribe the statements of the magis-
trate and the defendant, which were made before the pre-
liminary hearing was commenced. The foregoing statements
are not contradicted, except by the defendant's general state-
ment, in his affidavit filed in support of his motion to quash
the information, that he had not been advised of his legal

rights. Defendant's counsel, however, insists that the district court committed error in admitting the affidavits of the magistrate, county attorney, and the stenographer in evidence, and in considering them. In this connection counsel have cited a number of cases in which the courts state the importance of giving one who is charged with a felony a proper preliminary hearing, and of advising him of his legal rights, and that he is entitled to the assistance of counsel. Among the cases are the following: *People* v. *Barnes,* 66 Cal. 594, 6 Pac. 698; *Kalloch* v. *San Francisco* (Sup. Ct.) 56 Cal. 229; *People* v. *Crowley,* 13 Cal. App. 322, 109 Pac. 493; *State* v. *Jensen,* 34 Utah, 166, 96 Pac. 1085; *State* v. *Hoben,* 36 Utah, 186, 102 Pac. 1000.

There is absolutely nothing in those cases which in any way lends any aid to counsel's contention, or which could be construed as holding that the preliminary hearing in this case was improperly held. We have often pointed out the importance of giving those, who may be charged with serious offenses, the preliminary hearing which is contemplated by our Constitution and Criminal Code. The important matter, however, is that the purpose and spirit of the statute are carried into effect rather than that any particular form of record be made by the magistrate. Indeed, the statute does not prescribe any form for the magistrate to follow.

Nor do we think that the defendant would be bound by the recitals or statements in the magistrate's record, whatever they might be, if he could show that, notwithstanding the magistrate certified that the defendant was given a preliminary hearing provided by the statute, and recited all the facts, and further that he was informed of all of his legal rights, when such was contrary to the truth. To so hold would make a delusion and a snare of what are intended as very humane and salutary statutory provisions and as safeguards against possible pitfalls upon the part of those who are ignorant of court proceedings in case they are charged with serious crimes. If a defendant is not precluded from asserting and making evident the actual facts respecting the preliminary hearing, and that he was not informed of his

legal rights, and was not permitted to obtain the assistance of counsel, why should the state be prevented from showing that the defendant had, in fact, been informed of every right provided for by statute, and that he had declined to exercise the rights? If such were the fact, and the magistrate had failed to make a complete record of the proceedings of all that occurred, why could not the district court permit the magistrate to make the record speak the truth and to complete the same by inserting therein what had actually occurred? That is all that was done in this case, and there is not the slightest intimation in the record that the defendant was prejudiced in any substantial right by reason of what was permitted to be done by the district court. The general rule that a record made of a preliminary examination may be amended is well stated in 16 Cyc. § 631, p. 345, in the following words:

"After the justice has certified the record of a preliminary examination, he may, upon the trial and by the direction of the court, amend, or complete his record, where it is deficient, by inserting additional or corrected entries consistent with the record as previously made out and certified."

The foregoing text is supported by numerous authorities, among which we refer to the following: *Norwood* v. *State,* 14 Okl. Cr. 637, 169 Pac. 656; *People* v. *Wright,* 89 Mich. 70, 50 N. W. 792; *Bradshaw* v. *State,* 16 Okl. Cr. 624, 185 Pac. 1102; *State* v. *Geary,* 58 Kan. 502, 49 Pac. 596; *State* v. *Handrub,* 113 Kan. 12, 213 Pac. 827. Moreover, our statute (Comp. Laws Utah 1917, § 7531) provides that the entries in a justice's docket or the transcripts thereof, when certified to by the justice of the peace, "are prima facie evidence of the facts so stated." While the foregoing provision is found in the Code of Civil Procedure, yet it is there found under the head of "General Provisions Relating to Justices' Courts," and in the absence of any other provision there is no reason whatever why it should not apply to the docket, entries of a justice in criminal as well as in civil proceedings. The statute, therefore, contemplates that the recitals contained in a justice's docket are merely prima facie evidence.

In this connection it is also contended that, in view that the defendant is a foreigner, and was not familiar with the English language, the magistrate should not have proceeded with the preliminary hearing without first appointing and swearing an interpreter for the defendant, and that the failure to do that vitiated the preliminary hearing. In answer to that contention, it is sufficient to state that the record discloses that the defendant was at least sufficiently conversant with the English language to make the appointment of an interpreter a matter of discretion on the part of the magistrate. And that would be so even though a request for an interpreter had been made, which was not done. The record, however, affirmatively shows that the defendant was not misled to his prejudice in anything that he said or did prior to or at the preliminary hearing. Indeed, it is apparent from the record that the defendant exhibited more than ordinary caution and discretion under the circumstances.

It is further contended that the mere fact that the defendant was required to submit to a preliminary hearing so speedily after the homicide was alone sufficient reason why the information should have been quashed, and the preliminary hearing set aside. A mere reference to the provisions of the sections of the statute which we have quoted is sufficient answer to this contention. No specific time is required to elapse between the arrest of one who is charged with the commission of a felony and the preliminary hearing. Neither is there any need for any specific time, provided always that the accused is informed of his legal rights, and is proceeded against as provided by our statutes, or in case he expresses a willingness to proceed. Indeed, every defendant is entitled to a speedy preliminary examination.

It is next urged that the district court erred in denying the defendant's application for a continuance of the trial. While it is true that the time between the preliminary hearing and the trial was only a little more than 30 days, yet there is nothing made to appear why the defendant could

not as safely proceed to trial at the time the trial was had
as at any other time, except that the homicide was still fresh
in the minds of the public. While in cases of great excite-
ment the trial court should exercise great caution in pro-
tecting one charged with a serious offense from being tried
under great public excitement, yet there is nothing
in this record which indicates that the defendant's     6, 7
rights were not fully safeguarded, and, as will herein-
after appear, the record affirmatively shows that there was
no undue public excitement or prejudice against the defend-
ant. Moreover, the record is clear that every aid was given
the defendant in procuring witnesses, and there is not a sug-
gestion anywhere that every witness he desired was not ob-
tained, nor that the state did not produce every witness who
knew anything about the case whether it was for or against
the defendant. There is therefore nothing to show that the
defendant suffered any prejudice through the speedy trial.
Besides, the question of whether a continuance should have
been granted or not rested largely within the discretion of
the trial court. *State* v. *Anselmo,* 46 Utah, 137, 148 Pac.
1071. Under such circumstances it would be a mere travesty
of justice to reverse a judgment merely because one charged
with a grave offense was speedily tried, and upon such trial
convicted.

It is, however, also insisted that the district court com-
mitted prejudicial error in denying defendant's motion for a
change of place of trial from Summit county to some other
county in the district. The defendant filed his own affidavit
and his counsel also filed his affidavit in support of the motion
for a change of the place of trial. In these affidavits it was
made to appear that, in the judgment of the affiants, the
defendant could not have a fair and impartial trial in Sum-
mit county on account of the feeling of bias and prejudice
on the part of the public against the defendant. In answer
to this the state filed at least 50 affidavits of citizens of Sum-
mit county, which denied that there was any undue feeling
or prejudice against the defendant and they further stated
that the defendant could and would receive a fair and im-

partial trial in Summit county. Upon consideration of the affidavits for and against the motion, the district court denied the motion, and the trial was proceeded with in Summit county. This court is also committed to the doctrine that a motion for a change of place of trial is addressed to the sound discretion of the trial court, and that unless it is made to appear that the court abused its discretion in that regard this court may not interfere. To that effect are the following, among other cases: *State* v. *Carrington,* 15 Utah, 480, 50 Pac. 526; *State* v. *Haworth,* 24 Utah, 398, 68 Pac. 155.

It is further contended that a new trial should be ordered for the reason that the district court, contrary to defendant's request, permitted the jury who tried the case to separate during the trial. There is no merit to this contention. The question under our statutes, was one for the trial court to determine. *People* v. *Callaghan,* 4 Utah, 49, 6 Pac. 49; *State* v. *Cerar,* 60 Utah, 208, 207 Pac. 597. Moreover there is nothing made to appear that the defendant was in any way prejudiced by the court's ruling.

It is further contended that the district court erred in denying several of defendant's challenges to several jurors for cause. The record does not disclose whether the defendant exhausted all of his peremptory challenges or not. The record does, however, show that the objectionable jurors were all eliminated from the panel, and did not sit in the trial of the case. It is quite clear that no prejudice resulted from any of the court's rulings in that regard.

It is, however, also contended that the court erred both in propounding and in permitting the state to propound certain questions to some of the prospective jurors in determining their qualifications to sit in the case, and it is especially urged that the court erred in certain statements that it made in the presence of the jury during the process of impaneling the jury. This opinion is already too long, and hence we shall refrain from enlarging upon this assignment. It must suffice to say that we have carefully read the record of the proceedings respecting the impaneling of the jury and all the

questions that were propounded to the prospective jurors and the answers they made thereto, together with the statements of court and counsel as they appear from the record.   In reading the answers of the jurors to the various questions propounded to them we became impressed with the fact that the jurors fully understood and appreciated the importance of the case, and that each juror seemed to understand what was expected of him and that he was not only able, but willing, to try the defendant fairly and impartially.

The instructions of the court covered every possible phase of the case, and were so clear and explicit that not a single exception is or could be urged against them.   Indeed, the record affirmatively shows that the court with meticulous care safeguarded every legal right of the defendant, and that he received precisely what the Constitution and the statutes of this state guarantee to everyone, namely, a fair and impartial trial.

While there are other minor assignments which relate to the rulings of the district court in the admission and exclusion of evidence there is no merit in any of these assignments, and hence we shall refrain from specially referring to them.   After a careful scrutiny of the record we are forced to the conclusion that the defendant was ably defended; that he had a fair and impartial trial, and that no other result than the one reached by both the court and jury was legally permissible.

From what has been said, it follows that the judgment should be, and it accordingly is affirmed.

WEBER, C. J., and GIDEON, THURMAN, and CHERRY, JJ., concur.

On Application for Rehearing.

PER CURIAM.   Appellant's counsel, Hon. John F. Tobin, has filed a petition for rehearing upon the ground, stating it in counsel's own words, "that the appellant was deprived of his substantial rights, in that he was not given a fair and impartial trial before a fair and impartial jury.   In other words, we respectfully contend that the trial court erred in

denying defendant's motion for a change of venue.'' In counsel's argument in support of his petition for a rehearing it is very earnestly insisted that this court erred in refusing to order a new trial upon the ground that the district court had grievously erred in denying appellee's motion for a change of venue. The whole argument is based upon the ground that, on account of the prejudice prevailing against the appellant in Summit county, he did not and could not have a fair and impartial jury to try him.

In view that the appellant stands convicted of a capital offense, we have again gone into the record with a view of determining whether anything had been overlooked which might justify a new trial. After again going over the record of the proceedings, we are still unable to discover anything which justifies counsel's contention as outlined above. The crime was committed in Park City, a mining town in Summit county. Not one of the 12 jurors who tried the case lived in Park City, nor in its vicinity. Of the 12 men who tried the case 6 lived at Coalville, the county seat of Summit county, one lived at Hennefer, one at Hoytsville, one at Peoa, one at Wanship, one at Kamas, and one at Oakley, all of which are small towns in Summit county. The record also shows that, out of the 12 jurors who tried the case, not one was challenged for cause, and after carefully reading the examination of the jurors, all of which is contained in the bill of exceptions, there was no cause for such a challenge. The record, however, further shows that the appellant did not exhaust the full number of his peremptory challenges, and hence counsel, at the time the jury was impaneled, must have been satisfied that the jurors had qualified as fair and impartial men. Nor is there anything in the record from which anyone could infer, much less assert, that there was any misconduct on the part of any juror or on the part of anyone else connected with the trial that, in any way, prejudiced or could prejudice the appellant. True it is that counsel, in support of the motion for a change of venue, filed his own and appellant's affidavit to which were attached a considerable number of newspaper clippings, which were clipped

from newspapers published at Salt Lake City, in the county west of Summit county, and which newspapers, it is shown, circulated in Summit county. In those clippings, as is usually the case, the crime and the perpetrator thereof were denounced in strong language. The record, however, also shows that these newspapers circulated in practically all of the other counties of the state; and hence, if the newspaper articles had any effect, the effect would in all probability have been the same in whatever county the case might have been sent to for trial. But, with due deference to counsel's insistence that the appellant was prejudiced by the newspaper articles we can find nothing in the record which justifies us in arriving at such a conclusion, and it seems the trial court was impressed in the same way.

Counsel has cited, and strongly relies on, the case of *Scribner* v. *State*, 3 Okl. Cr. 601, 108 Pac. 422, 35 L. R. A. (N. S.) 985. The question presented to the court in that case is clearly reflected from the introductory statement of the court. The court said:

"In this case we are called upon to say whether a man shall be deprived of his life by the verdict of a jury, when the record discloses that 10 of the persons called and examined as jurors said under oath that they had formed an opinion as to the guilt of the defendant, and that it would require evidence to remove that opinion."

We do not only concede, but we affirmatively assert that to try a person, however guilty, to a jury thus disqualified would be a mere travesty of justice. Upon the other hand, we assert, with equal confidence, to order a new trial in view of the record in this case would likewise constitute a travesty of justice.

All persons charged with crime should be given a fair and impartial trial, but when one accused of a crime, however heinous, has been given a fair and impartial trial in a court of competent jurisdiction, it would constitute a grievous wrong to grant a new trial merely because one shrinks from the consequences which under the law follow the conviction of such a crime.

Without going into further detail, it must suffice to say that nothing is made to appear that would justify this court in granting the petition for rehearing, and the same is therefore denied.