## STATE v. KUKIS.

No. 4240.   Decided April 1925.   (237 P. 476.)

1.  HOMICIDE—EVIDENCE HELD TO SUSTAIN CONVICTION FOR MURDER.
    In prosecution for murder arising out of strike disorders, evi-
    dence *held* to sustain conviction.

2.  CRIMINAL LAW—DISCRETIONARY WITH TRIAL COURT TO GRANT OR
    REFUSE CHANGE OF VENUE AND ACTION NOT INTERFERED WITH,
    UNLESS ABUSED.   Granting or refusing a motion for change of
    venue is within sound discretion of trial court, and Supreme
    Court will not interfere in exercise thereof, unless an abuse of
    discretion is shown.[1]

3.  CRIMINAL LAW—NO ABUSE OF DISCRETION SHOWN IN DENYING
    MOTION FOR CHANGE OF VENUE IN MURDER PROSECUTION.   No
    abuse of discretion was shown in denying motion for change
    of venue in murder prosecution arising out of strike disorders,
    where affidavits of prejudice submitted by defendant were
    largely controverted by affidavits submitted by state, and it
    appeared from examination of jurors on their voir dire that
    none of them was in sympathy with either strikers or com-
    panies or had any feeling of prejudice or bias or opinion one
    way or the other on merits of case, and the jury was completed
    with little difficulty and without defendant exhausting his per-
    emptory challenges.

4.  HOMICIDE—REFUSAL OF DEFENDANT'S REQUESTED CHARGES HELD
    PROPER UNDER THE EVIDENCE.   In prosecution for murder arising
    out of strike disorders, refusal of defendant's charges that there
    was no evidence tending to show a combination or confederacy
    entered into by strikers, including defendant, in making the
    unlawful attack in which deceased was killed, or that defendant
    was present and participated in such attack, *held* proper under
    the evidence.

5.  CONSPIRACY—EACH CONSPIRATOR IS RESPONSIBLE FOR ACTS OF
    ASSOCIATES COMMITTED IN FURTHERANCE OF COMMON DESIGN FOR
    WHICH THEY COMBINED.   Where several combine together to
    commit an unlawful act, each is responsible for acts of his asso-
    ciates committed in furtherance thereof, and, in contemplation
    of law, act of one is the act of all, each being responsible for

---

[1] *State* v. *Cano*, 64 Utah 87, 228 P. 563; *State* v. *Riley*, 41 Utah,
225, 126 P. 294.

everything done by his confederates, which reasonably follows in execution of the common design as one of its probable and natural consequences, even though it may not have been intended as a part of original design or common plan.

6. HOMICIDE—DEFENDANT WAS GUILTY OF MURDER, IF THERE WAS A COMBINATION TO COMMIT UNLAWFUL ASSAULT RESULTING IN TAKING OF LIFE OF DECEASED. In murder prosecution arising out of attack by strikers on strike breakers, it was not essential that there should have been an agreement or an understanding to kill deceased, it being enough that there was a combination to commit the unlawful assault, execution of which naturally might have resulted in taking of human life.

7. HOMICIDE—CHARGE THAT DEFENDANT WAS NOT GUILTY, UNLESS PRESENT AT ATTACK, AND EITHER COMMITTED MURDER, OR, BEING PRESENT, AIDED AND ABETTED, IN ITS COMMISSION, HELD PROPER. In murder prosecution arising out of attack made by strikers on strike breakers, charge that to convict defendant it was necessary that he was present at attack and either committed the murder, or, being present, aided and abetted in its commission, and that, if jury entertained a reasonable doubt as to whether defendant was at scene of murder or whether he participated or aided or abetted therein, then he should be acquitted, *held* proper.

8. CRIMINAL LAW—MODIFICATION OF DEFENDANT'S INSTRUCTION IN MURDER PROSECUTION HELD HARMLESS. In murder prosecution arising out of strike disorders, modification of defendant's instruction that fact that defendant was a coal miner prior to strike, and that on that date he went out on a strike with other miners, would not be any evidence of existence of an agreement "or conspiracy" on his part with other persons to take life of deceased, etc., by striking out of quoted words, *held* harmless, since defendant still had benefit of all essentials of requested instruction.

9. HOMICIDE—CONVICTION OF DEFENDANT FOR SECOND DEGREE MURDER, WHERE THERE WAS EVIDENCE TO SUPPORT FIRST DEGREE, HELD NO GROUND FOR COMPLAINT. Conviction of defendant for second degree murder, where there was evidence to support a conviction for murder in the first degree, *held* no ground, for complaint, since, if there was evidence to show, murder in first

degree, necessarily there was also evidence to show lesser, and necessarily included offense of second degree murder.[2]

10. HOMICIDE—FIRST DEGREE MURDER EMBRACES ALL ELEMENTS OF SECOND DEGREE. First degree murder embraces all elements and essentials of second degree, and consists of additional elements.

Appeal from District Court, Seventh District, Carbon County; *F. E. Woods,* Judge.

Pete Kukis was convicted of murder in the second degree, and he appeals.

AFFIRMED.

*King & Schulder,* of Salt Lake City, for appellant.

*Harvey H. Cluff,* Atty. Gen., and *L. A. Miner,* Asst. Atty. Gen., for the State.

STRAUP, J.

The appellant, Pete Kukis, in the Seventh judicial district in and for the county of Carbon was charged with having committed murder in the first degree, the killing of A. P. Webb, on the 14th day of June, 1922. On December 6, 1922, he was convicted of murder in the second degree, and was sentenced to life imprisonment, from which judgment he has prosecuted this appeal.

[2] *People* v. *Dillon,* 8 Utah, 92, 30 P. 150.
See Headnote 1.   40 C. J. p. 310.
Headnote 2.   16 C. J. p. 204, 17 C. J. p. 232.
Headnote 3.   16 C. J. pp. 205, 214.
Headnote 4.   30 C. J. p. 396.
Headnote 5.   12 C. J. pp. 577, 578.
Headnote 6.   29 C. J. pp. 1073, 1075.
Headnote 7.   30 C. J. p. 394.
Headnote 8.   16 C. J. p. 1068.
Headnote 9.   30 C. J. p. 452.
Headnote 10.   29 C. J. p. 1104 (Anno.).

The principal assigned errors are: Insufficiency of the evidence to connect the defendant with the commission of the offense; the refusal of the court to grant the defendant a change of venue from the county in which the alleged offense was committed; and exceptions to portions of the charge and the refusal of the court to give certain requests of the defendant.

In Carbon county a number of coal mines were being operated by different coal companies and a large number of coal miners employed, chiefly foreigners including many Greeks. There are various settlements or coal camps at or near the mining operations, including those of New Helper townsite and Standardville. In April, 1922, a general strike of coal miners were declared in about all of the coal mines in the county. The miners who chiefly responded to the strike and quit work were Greeks and other foreigners, many of whom were members of a miners' union. The appellant, a Greek, was one of the strikers. The strike resulted in disorders, disturbances, and interferences usually incident to strikes of such magnitude, growing out of the desire and attempt of the employer to operate his property and carry on his business and efforts of the strikers by coercion, intimidation, and interference to prevent his so doing. Many of the strikers who had been occupying houses and properties of the different coal companies and who quit and refused to work were compelled to vacate such premises. Many of such strikers put up or lived in tents on lands other than those owned or occupied by the coal companies. Among other places there was such a tent colony composed principally of Greek strikers occupying about 70 tents a short distance from New Helper townsite just northerly and westerly of Helper. A short distance north of that is the town of Castle Gate on the main line of the Denver & Rio Grande Railroad Company. From Castle Gate a short line of railroad known as the Utah Railway runs in a southwesterly direction, one branch to Standardville in a more westerly direction and one to Hiawatha in a more southerly direction. Standardville is but a short distance westerly from

New Helper townsite, The country is mountainous, and covered with rock, cedars, and brush. Among other canyons is the one called Spring Canyon, running from near New Helper townsite up the mountains towards Standardville and other places. A wagon road or highway extends along the canyon from New Helper townsite to Standardville. The first railroad station of the Utah Railway after leaving Castle Gate is Martin. A short distance from Martin the railroad runs through a tunnel about 800 feet long, entering Spring Canyon proper, and then runs more westerly towards Standardville along the side of the mountain for a distance of 1,000 or 1,100 feet, where the track enters a cut and continues on westward toward Standardville. The railroad track, as it emerges from the tunnel, is constructed on a raise about 40 or 50 feet above the wagon road, and runs substantially parallel with it. Near where the track emerges from the tunnel and for some distance westerly the highway is about 100 feet south of the railroad track. To the north of the track and to the south of it between the track and the highway are rock, cedars and brush. Adjoining the highway on the south was an orchard, an alfalfa field with growing alfalfa about knee-high, ditches, and fences; to the south of that Spring Canyon creek.

The defendant, from July, 1920, until the strike, worked in a coal mine at Standardville. He went out on the strike, but remained about Standardville and Spring Canyon, as testified to by him, until about June 1, 1922, and then went to Helper, and remained about there until after the homicide. Other witnesses testified he was around Standardville and Spring Canyon later than June 1st. He had served in the Grecian army in Greece, and had military training. Because of the strike and of the disorders and disturbances incident thereto, the various coal companies, as well as some of the railroad companies hauling coal from the mines had watchmen and guards stationed about their properties and on the highways leading to them and to the coal camps. The guards were appointed deputy sheriffs of the county, but were on the pay roll of the respective coal and railway

companies. On the morning of June 14, 1922, the day of the homicide, a number of men arrived at Castle Gate on a train of the Denver & Rio Grande Railroad Company to be taken to Standardville to work in the coal mine of the Standard Coal Company, the camp where the defendant worked before he went out on the strike. These men by counsel for the appellant are called "strike breakers," "scabs," and "scales." The superintendents of the Standard Coal Company and of the Utah Railway Company were informed of the arrival of these men at Castle Gate, and went there to meet them and make arrangements to take them to Standardville. The coach in which they were carried was that morning, on the arrival of the train at Castle Gate, switched from the Denver & Rio Grande Railroad Company's track to the track of the Utah Railway. The regular train crew, however, refused to operate the train with those men on it. Thereupon the superintendent of the Utah Railway Company himself acted as engineer, and with another as fireman operated the train from Castle Gate to Martin. There some empty coal cars were switched out of the train, and from thence on the train consisted of only the engine and the coach carrying the men. The superintendent of the Utah Railway Company continued to act as engineer, and from Martin on the deceased, A. P. Webb, acted as fireman. Both of them had had past experience in such work. As the train thus proceeded from Martin southwesterly and through the tunnel, and then more westerly, the superintendent was on the north side, and Webb on the south side, of the cab of the engine towards the wagon road. With them on the train besides the men carried by them was the superintendent of the Standard Coal Company, who stood on the north side between the engine and tender, three guards of the railway company who stood on the front steps and platform of the coach, and one guard on the rear platform. All were armed with rifles or revolvers, some having both, except the engineer, who was unarmed. They were armed, as stated by them, because of prior disturbances and disorders growing out of the strike and of interferences in the operation of the

coal properties, and as one of the witnesses put it, because
a few days prior to the homicide the strikers "shot up the
mine, shot down on the man trip, and there was a quite a
bit of trouble and disturbance, and a person would natu-
rally look for trouble." The record further discloses that
claims were made that the sheriff's force of the county was
unable to cope with the situation; that demands had been
made on the Governor of the state for aid to maintain order;
and, that no such aid was given up to the time of the homi-
cide, but was given on the next day when the National Guard
was called out and martial law declared in parts of the
county, especially around Helper and New Helper townsite.

On the morning of the homicide the train left Castle Gate
at about 8 o'clock, and emerged from the west portal of the
tunnel at about 8:30. The tents of the Greek colony near
New Helper townsite were but a short distance from the
west portal of the tunnel—but a few minutes walk. A short
time before the train emerged from the tunnel a crowd of
Greeks, variously estimated by witnesses from 65 to 100 in
number, many of them armed with rifles, pistols, revolvers,
and clubs, came from, or from the direction of, the tents
near or at New Helper townsite, up the canyon along the
wagon road and opposite the railroad about 100 feet west
of the tunnel, some of them going behind cedars and rock,
some into the orchard, some into the alfalfa field, while others
were strung along the highway near the fences and a ditch.
After the train emerged from the tunnel about 100 feet they
shot at and towards those on the train, who in turn shot
at the Greeks, and a fusillade of shots followed. As the
train emerged from the tunnel it was going at a speed of
from 15 to 20 miles an hour, but increased its speed until
it reached the cut about 1,000 or 1,100 feet from the west
portal of the tunnel. Within that distance, and within a
little more than 30 seconds, the witnesses estimated 300 shots
were fired, of which not more than 30 or 40 were fired by
those on the train. The deceased, who was in the cab of
the engine on the fireman's side, was shot through the heart
by one of the Greeks below, and instantly killed. A number

of bullets shot from the roadside struck the engine, tender, and coach.   One of the guards on the train was slightly wounded in the leg, and another in the ear, by a split bullet. So far as disclosed, but one man of the Greeks was wounded. He was shot in the arm.   The train went on a short distance, when it was stopped in a tunnel beyond.   There were several government surveyors on the ridge just north of the place of the shooting and who witnessed the shooting.   They left their automobile truck that morning along the roadside. As soon as the shooting ceased the truck was procured, and the wounded Greek taken to Helper.   Some difficulty was had in unlocking the truck.   It was about 10 minutes after the shooting ceased when the truck started for Helper.   It was driven by one of the surveyors, and with him on the front seat was a guard of the railway company stationed at the junction of the mainline and the spur track near the scene of the shooting.   While the truck was being unlocked and the wounded Greek placed on it, about 15 or 20 Greeks, some of whom had rifles, revolvers, and ammunition, gathered around the truck.   The surveyor identified the defendant as one of them, but did not notice whether he had a gun or not. When the truck started for Helper 15 or 20 of the Greeks with their guns and ammunition boarded the truck.   Another of the surveyors held the head of the wounded Greek in his lap.   He also identified the defendant as being by the side of the wounded Greek and talking with him.   It was but a few minutes until the truck reached New Helper townsite.   There the Greeks left the truck and took their guns and revolvers and ammunition with them.   They also wanted the wounded Greek there to be taken off the truck, but the surveyor and guard refused to do so, and took him to Helper for surgical aid.   One of the guards on the train, and standing on the steps of the coach, and who was acquainted with the defendant for about two months prior thereto, and who had frequently seen him around the stores, pool halls, and on the streets at Standardville, testified that during the shooting he saw and recognized the defendant along the road side, down near the fence, about 100 feet from

the moving train, with "a small arm," a revolver or pistol, in his hand, shooting towards the train, and saw the smoke from the gun held in his hand; and that the witness shot at him and at another Greek, 100 or 150 feet from the defendant. This witness, three days after the homicide, from a crowd of about 150 Greeks who were detained by the militia, pointed out and identified the defendant as being the man the witness saw down by the roadside shooting towards the train. The point is made by counsel for the defendant that the witnesses for the state testifying to the shooting were unable to testify what particular person fired the first shot. However, all of them testifying on the subject testified, and the record without substantial dispute shows that the first shot came from the place down by or near the wagon road where the Greeks were lying in ambush awaiting the on-coming train, and that instantly a fusillade followed. The inability of the witnesses to state who of those so lying in ambush fired the first shot is, under the circumstances, of no controlling importance or probative value.

The defense was that the defendant was not at the scene of the shooting and in no particular aided or abetted or participated therein; that he was in Helper during all of the time of the shooting, and knew nothing of it until some time thereafter, when the truck came up with the wounded Greek. His testimony was corroborated and supported by a number of Greek associates and acquaintances who testified as to the whereabouts of the defendant during all the time of the shooting where he slept the night before, when he arose in the morning, the time he had breakfast, and as to his movements about Helper until the truck arrived. There was thus a direct conflict in the evidence as to whether the defendant was or was not at the scene of the shooting and aided and abetted or participated therein. That there was a combination and a preconceived intent of those lying in ambush to make an unlawful and felonious assault upon those on the train is amply supported by the evidence. There is no substantial conflict as to that. On the record there is no other reasonable inference. As already observed, the

train left Castle Gate at about 8 o'clock, and emerged from the tunnel at about 8:30 in the morning. Just before that, three Greeks were first seen hurriedly coming up the canyon road from the direction of the tents near New Helper townsite, immediately following them 19 or 20 more, then others, in all 65 to 100, all in work clothes—one witness testifying he counted 72 of them, and then stopped counting—and all with hurried steps taking positions behind cedars, rock, in the orchard, alfalfa field, fences, and the ditch along the highway. The witnesses were not able to testify whether or not all of them had rifles or guns, but that many of them did have, and that some had revolvers, pistols, and clubs. As the train emerged from the tunnel one of the Greeks swung a club over his head, which was followed by shooting from down below, where the Greeks were. There is a just inference that every one of the crowd of Greeks coming up the wagon road, under the circumstances described by the witnesses, was there for a common and unlawful purpose, and participated or aided and abetted in the assault. On the record there is no other rational conclusion. True, some of them might have been there simply to witness the assault. But such. if any there were, would not be there with gun in hand shooting towards the train. There thus is evidence to justify a finding of a combination or confederacy or a concert of action of this armed crowd or mob hurriedly coming up the canyon road, with a unity of purpose and design, and with force and violence, to make an unlawful and felonious assault upon those on the train; that all who were members or a part of such crowd or mob, especially those who were armed, participated in the assault, or aided and abetted therein; and, though the evidence does not show whether it was or was not the bullet shot by the defendant or by another of the mob or crowd which killed the deceased, nevertheless the record indisputably showing that the deceased was killed by a bullet shot by one of the crowd or mob of which the defendant was one and participating in the shooting—himself shooting at or towards the train—the jury was justified in finding him guilty as

though it was the bullet shot by him which killed the deceased. We thus think the evidence sufficient to support the verdict and judgment.

A motion was made by the defendant for a change of venue. The court denied the motion. Complaint is made of the ruling. The motion was supported by an affidavit of the defendant and by his counsel and by 600 or 700 additional affidavits, not separate affidavits, but affidavits made jointly by a number of affiants. The state, opposing the motion, filed about 300 counter affidavits. The substance of the affidavits on behalf of the defendant is that there was a great deal of agitation and discussion throughout the county concerning matters growing out of the strike and the circumstances relating to the alleged offense; that persons who were arrested, including the defendant, were striking coal miners, and engaged in a coal strike, and continued as such strikers until the time of their arrest, and that the strike had not "been officially terminated" when the case was set for trial; that, when the strike was called, most of "the American citizens" employed by the various coal companies refused to strike, and remained at work; that other persons, by these affiants called "scabs" and "strike breakers," were brought into the county and put to work in place of the strikers; that thereupon numerous disturbances and disorders had arisen, and the situation was such that the county commissioners and the sheriff were unable to cope with it, and had made demands on the Governor of the state for aid to preserve law and order, but that no such aid was given until the day after the homicide, when the National Guard was sent into the county, and martial law declared in parts thereof; that the various coal companies had employed a number of guards who were deputized as deputy sheriffs, but were paid by the coal companies to guard and protect their properties and carry on their business and to prevent interferences from the strikers, and in such connection it was alleged that such guards terrorized and intimidated the strikers and abused their rights and privileges; that there was much propaganda spread over

the county by the coal companies, and those in sympathy with them, that the Greeks were lawless, had no respect for law or order, and no regard for the rights or liberties of others, and that the strikers were a menace to the community; that throughout the county there were many of the public who were in sympathy with the strikers and many with the coal companies, and many citizens who were under the domination and influence of the coal companies; that matters concerning the strike and incidents growing out of it had been discussed generally over the country; that a feeling of hatred, ill will, bias, and prejudice was engendered against the strikers, and especially against the Greeks participating in the strike; that various publications were had in newspapers published in the county and in about all of the newspapers published in Salt Lake City and which circulated in the county, and in which matters and things were recited and published derogatory to the strikers and to the Greeks participating in the strike and accounts and circumstances recited and published concerning the commission of the alleged offense and the strikers connected therewith, the matters and things so recited and published being set forth in some of the affidavits; and that in the opinion of the affiants, because of the matters and conditions stated in the affidavits, the defendant could not have a fair and impartial trial in the county where the alleged offense was committed.

In the counter affidavits on behalf of the state it is recited that most of the affidavits made on behalf of the defendant were made by Greeks and strikers, many of whom could not speak the English language, and who were not in position to know and had no knowledge of the matters and things recited by them in their affidavits, and the state by its affidavits denied all the material allegation in the affidavits on behalf of the defendant, except the allegations respecting the publications in the newspapers, and averred there was no prejudice or bias against the Greeks as such, and no propaganda, except as carried on by the Greeks themselves; and recited facts and circumstances showing that

the defendant could have a fair and impartial trial in the county where the alleged offense was committed. Many of the affidavits on behalf of the state were made by those who were disinterested and who were in a position to know the feeling and sentiment of the people generally throughout the county, and upon the facts and circumstances stated in their affidavits the affiants expressed the opinion that the defendant could have a fair and impartial trial in the county where the offense was committed, and that there was no general feeling of prejudice or hostility against him.

Further, the proceedings as to the examination of the jurors on their voir dire are in the record. But little difficulty was experienced in obtaining a jury. A few of the jurors who were called stated they had either read of the case or heard it discussed, and had either formed or expressed an opinion concerning the guilt or innocence of the defendant, but on challenge for cause by the defendant and not resisted by the state were promptly excused by the court. Only one or two of the jurors called expressed any feeling of prejudice or hostility against Greeks or the strikers, but they also were promptly excused for cause. Some of the jurors called were employés of or otherwise connected with some of the coal companies; but they too were excused either for cause or challenged peremptorily by the defendant. When the jury was finally impaneled the defendant had left one unused peremptory challenge. No complaint is made that any of the jurors who sat in the case was unfair or partial, or that anything was shown on the examination on voir dire which in the least tended to show that any of them was in any particular prejudiced or biased, or could not sit and try the case fairly and impartially. The jurors who tried the cause came from different parts of the county, and by a most searching examination made of them on voir dire it was clearly shown that none of them was in sympathy with either the strikers or the coal companies or had any feeling of prejudice or bias or had any opinion one way or the other on the merits of the cause. All were shown to be fair, true, and competent jurors. No complaint       **2, 3**

is made to the contrary or that any difficulty was experienced in obtaining a fair and impartial jury. The scope and effect of the examination shows that the material allegations of the affidavits on behalf of the defendant were unfounded.

Moreover, the affidavits on behalf of the defendant and the state, as to material allegations, were in conflict. In considering them the court was required to weigh them and to ascertain the true situation and to exercise a sound discretion in passing on the motion. It is well settled in this jurisdiction that the granting or refusing of such a motion is within the sound discretion of the trial court, and that this court will not interfere in the exercise thereof, unless an abuse of discretion is shown. *State* v. *Cano*, 64 Utah, 87, 228 P. 563; *State* v. *Riley*, 41 Utah, 225, 126 P. 294. Here no abuse is shown. On the record, we think the court was justified in denying the motion.

The defendant requested the court to charge the jury that there was "no evidence" to show that the defendant killed the deceased, or that he prior to the killing "aided, abetted, assisted, or counseled the killing of the deceased," and under such circumstances, though the deceased met his death unlawfully and at the hands of persons unknown to the jury, and if they entertained a reasonable doubt as to whether defendant in any manner participated therein, then the defendant would not be guilty. Other requests were proposed that "there was no evidence" to show that a conspiracy existed between defendant and other persons to attack or interfere with or prevent "the operation of the train," and "no evidence to show that the defendant was acting in conspiracy with any other person or in aid of any plan or purpose on the part of any other person to prevent the operation of the train," or that the defendant prior thereto conspired with any person to engage in any such acts and that under such circumstances the jury would not be warranted in finding the defendant guilty of the crime charged, unless the jury found beyond a reasonable doubt that the defendant was present in person and actively participated

in the unlawful attack in which the deceased was killed.
Further requests were proposed that there was "no evi-
dence" to show that the deceased lost his life as the result
of any conspiracy on the part of any person or persons with
whom the defendant was actively participating, and that
the jury, for such reason, were not justified in convicting
the defendant. These requests were refused. In such par-
ticular the court charged that all persons concerned in the
commission of a crime, whether they directly commit the
act constituting the offense or aid and abet its commission,
are principals in the crime so committed; that, if two or
more persons are moved or influenced by a common intent
and purpose to commit an unlawful act, and in carrying out
such intent and purpose a human being is unlawfully killed,
and each knows of the common felonious intent and purpose
of the other to commit such unlawful act, then the act of one
is the act of all the participants, and all are responsible
under such circumstances for the act of each other; and,
if the jury from the evidence believed beyond a reasonable
doubt that the deceased was willfully, unlawfully, feloniously,
deliberately, premeditatedly, and with malice aforethought
killed as charged in the information, and that the defendant
was present and concerned in the commission of the un-
lawful act as charged in the information, whether he directly
committed the act constituting the offense, or aided and
abetted in its commission, the jury should find him guilty
as charged, although from the evidence the jury might find
he did not actually fire the shot that killed the deceased,
but that the shot was fired by some person acting in con-
cert with him.

Complaint is made of the court refusing the requests and
of the charge. We think there is no basis for the complaint.
The requests were properly refused, for on the record there
is evidence tending to show a combination or confederacy
entered into by all those, including the defendant, coming
up the canyon and making the unlawful and felonious
assault, and that he was present and participated in        4
such assault. It was not necessary to show any formal

agreement between the parties to do the unlawful act. A mutual implied understanding was all that was necessary so far as the combination or conspiracy was concerned; nor was it necessary that the plan of the combination should embrace in detail the means by which it was to be executed. Where several combine together to commit an unlawful act, each is responsible for the acts of his associates or confederates committed in furtherance thereof or in the prosecution of the common design for which they combined. In contemplation of law, the act of one is the act of all. Each is responsible for everything done by his confederates which reasonably follows in the execution of the common design as one of its probable and natural consequences,    **5, 6** even though it may not have been intended as a part of. the original design or common plan. It was not essential, as is implied in the request, that there should have been an agreement or an understanding to kill the deceased. It was enough that there was a combination or understanding to commit the unlawful assault, the execution of which naturally or probably might result in the taking of human life, or that human life as a natural consequence was taken in furtherance of and in the execution of the unlawful combination or agreement to commit the unlawful assault.

We think the charge correctly reflects the statute and the law on the subject. The court did not submit the case to the jury on the theory that the defendant might be found guilty, if he entered into the unlawful combination or into the conspiracy to commit the unlawful act and the death resulted in the absence of the defendant from the execution of such common design and purpose, but on the theory of his presence and himself committing or being present aiding and abetting in the commission of the unlawful act. In other words, the court in effect told the jury that to convict the defendant it was necessary for them to find that the defendant was present and either committed the act or, being present, aided and abetted in its commission. And elsewhere in the charge the court further charged the jury "that, if you shall entertain a reasonable doubt as to whether

or not he [defendant] was at the scene of the killing at the time and place in question, or if you shall entertain a reasonable doubt as to whether he participated in the said killing, or aided, assisted or abetted therein, then I charge you it would be your duty to give the defendant the benefit of such reasonable doubt and acquit him.'' The charge in such particulars was most favorable to defendant. He has no just ground to complain of it. His requests were properly refused because based on the fallacy that there was no evidence to show the presence of the defendant or that he participated in the assault or aided and abetted therein, and because they are inconsistent with the law.

Complaint is also made of an alleged refusal of the court to charge on the subject of circumstantial evidence as requested by the defendant, and of the charge given on that subject. The chief contention made is that the court did not instruct the jury that the proven circumstances must not only be consistent with guilt but also inconsistent with innocence, an element which, it is claimed, was embodied in the request but not in the charge. We think counsel in error as to that. The court charged ''that to warrant a conviction on circumstantial evidence each fact necessary to establish the guilt of the accused must be proven by competent evidence beyond a reasonable doubt, and the facts and circumstances proven should not only be consistent with the guilt of the accused, but must be inconsistent with any other reasonable hypothesis or conclusion than that of guilt, to produce in the mind a moral certainty that the accused committed the offense.'' The element in the request which thus is claimed was refused was in effect given.

The defendant also requested the court to charge that ''the mere fact that the defendant may have been a coal miner prior to the first of April, 1922, and that on that date he went out on a strike with other coal miners, would not be any evidence of the existence of an agreement or conspiracy on the part of defendant with other persons to willfully or unlawfully take the life of the deceased, for you are in-

structed that as a matter of law every person has a right to quit his place of employment if he so desires, and no improper inferences, presumptions, or conclusions can be drawn against such individual because he elects to terminate his employment." The court gave the request in every particular, except the words "or conspiracy," which were eliminated. We think the matter insignificant. The court well could have given the request with all the words "agreement or conspiracy," as was requested. By striking the words "or conspiracy" the court evidently thought the word "agreement" sufficiently covered the matter. The defendant had the benefit of all the essentials of the request. We do not see wherein he was harmed by striking the words "or conspiracy." When the court told the jury, as was done, that the circumstances stated would be no evidence of "an agreement," etc., it is difficult to perceive how the jury might or could have regarded them as evidence of a conspiracy or of anything relating to it.

A further contention is made that, if the defendant was guilty at all, he was guilty of first degree murder, and hence the court committed error in stating and submitting to the jury the elements and offenses of second degree murder and of manslaughter, the defendant urging there is no evidence to support a verdict of second degree murder or of manslaughter. We do not see how the defendant can complain of that. If on a charge as here there is evidence to show murder in the first degree, then of necessity is there also evidence to show the lesser and necessarily included offenses of second degree murder and of manslaughter. First degree murder embraces all the elements and essentials of second degree, and consists of additional elements. We need not pause to point them out. The proposition is familiar alike to the bench and bar. We thus think it self-evident that, if on a charge such as here there is sufficient evidence to show the commission of the greater offense, then of necessity must there also be sufficient evidence to justify a conviction of any necessarily included lesser offense. At any rate, the defendant can-

not be heard to complain because he was not found guilty of murder in the first degree instead of second degree, or because the jury was given an opportunity to find him guilty of the lesser, when they properly could have found him guilty of the greater offense. *People* v. *Dillon*, 8 Utah, 92, 30 P. 150. Further complaints are made respecting the refusal of other requests and other parts of the charge, but we think them of less merit than those already mentioned.

Upon a consideration of the whole record, we are of the opinion no error was committed. The judgment of the court below is therefore affirmed.

GIDEON, C. J., and THURMAN, FRICK, and CHERRY, JJ., concur.