## STATE v. BE BEE.

No. 6955. Decided December 18, 1946. (175 P. 2d 478.)

486

See 22 C. J. S. Criminal Law, sec. 196; 53 Am. Jur. 386.

*E. LeRoy Shields*, of Salt Lake City, for appellant.

*Grover A. Giles*, Atty. Gen., *Calvin L. Rampton*, Deputy Atty. Gen., and *Duane A. Frandsen*, Dist. Atty., of Price, for respondent.

WADE, Justice.

Hiram BeBee was convicted of the crime of murder in the first degree, the jury returning no recommendation and he appeals from the verdict and the sentence thereon.

Hiram BeBee, the appellant herein, to whom we shall hereafter refer as the defendant, is a slight old man weighing about 105 lbs., who purports not to know his true age, but from events he says he remembers it could be inferred that he is about 100 years old. His appearance does not comport with that of the average man of this day and age. He wears long braids and dresses in a style sufficiently different from that of the ordinary man as to attract the attention of the casual passer-by.

In the late afternoon of October 15, 1945, after a week-end trip to Provo, defendant and his wife were returning to their home in Spring City, Utah, in a friends' truck. Their route home took them through Mount Pleasant, Utah, where they arrived about 6 o'clock p. m. Defendant, who had hitherto never been in Mount Pleasant, decided to stop in that city and buy some beer to take home to another friend, whereupon he and the driver of the truck proceeded to a tavern where the driver purchased three bottles of beer and defendant ordered a glass of beer to drink on the premises.

Defendant while drinking his beer approached a table at which were seated a lady and some men and engaged in conversation with them. A short time later he was seen in conversation with Lon T. Larsen, the deceased, who was the city marshal of Mount Pleasant. From snatches of conversation overheard by some persons in the tavern, Mr. Larsen had apparently asked defendant his name and defendant had refused to tell him and in doing so had not been too respectful but had rather inferred it was none of his business. The evidence was contradictory as to whether defendant was aware of the fact that Mr. Larsen was the city marshal. There was testimony that Mr. Larsen, who was dressed in civilian garb, after some conversation with defendant, unbuttoned the sport coat he was wearing and showed defendant his badge. Be that as it may, Mr. Larsen did not arrest nor was he requested to arrest defendant, but he apparently did not like his manners and speech and proceeded to evict him from the tavern. When they came to the door, both stumbled and went to their knees, whereupon Mr. Larsen, who was much the younger, heavier and stronger of the men, picked up defendant and took one of his arms and placed it behind his back and propelled him rapidly down the street to where the truck in which defendant came was parked. After what appeared to be some more conversation between them, Mr. Larsen opened the truck door, picked up the defendant and threw him on the seat. Defendant's feet were sticking out of the truck so he pushed them in and closed the truck door. Mr. Larsen then turned to go up to the sidewalk when Mrs. BeBee emerged from a drug store nearby and demanded to know what he was doing with her husband. As he turned to answer, the defendant shot him causing him to stagger and fall and as he was floundering, defendant stepped out of the truck and shot him again. Defendant's story was that he shot him because he thought he was going for his gun when he turned around after he had stepped away from the truck. It developed that Mr. Larsen was not armed at the time.

After defendant had shot Mr. Larsen, he and his wife and friend got back into the truck and drove towards Moroni on their way back to Spring City. The city marshal of Moroni had been instructed to stop the red pick-up truck in which defendant was riding and when the truck approached the outskirts of Moroni he flagged it down. He attempted to take the keys of the car but after objection by defendant, he thought better of it and instead took the names and addresses of the occupants which they furnished him. They then drove on to their home in Spring City. At about 7:00 or 7:30 p. m. of that same day, the sheriff and some of his deputies arrived at defendant's home in Spring City, where they found a group of about 30 or 40 men, a great many of them with rifles and shotguns surrounding the house. Upon the sheriff's arrival he was invited into the house, whereupon he and his deputies entered to make the arrest. The crowd which had heretofore been on the outside followed the sheriff into the house. Because of the presence of the mob of men in the room, the defendant who was still armed refused to surrender his gun to the sheriff thus forcing the sheriff and his deputies to disarm him. They then took him to the county jail in Manti, Utah, and the next morning took him to the Salt Lake County jail.

After the information was filed against defendant, he moved for a change of venue on the ground that he could not obtain a fair and impartial trial in San Pete County because of the great prejudice against defendant as evidenced by the mob action both at the time of arrest and at the preliminary hearing. In support of such motion he filed affidavits to the effect that the feeling against him was so high that the sheriff was forced to remove him to the Salt Lake County jail for safekeeping; and that newspaper articles published in a number of newspapers circulating in San Pete County where the deceased was well known and had many relatives and where defendant was unknown, were inflammatory and also reflected the sentiment of the community towards defendant in that county. One such newspaper, the Mount Pleasant Pryamid, printed an article

which was made a part of defendant's affidavit, which purported to state the facts of the case and described the mob which surrounded defendant's home at the time of his arrest as

"crack shot deer hunters with their rifles, all ready for the annual deer hunt, and many duck hunters with shotguns, all eager to pull a trigger at the proper time. The sheriff appeared on the scene before action started. Feelings were running high and it was only the respect for the office of sheriff that some leader did not speak out. Many 'beads' were drawn by old and young, many said, 'This is the only time in my life that I have wanted to kill a man.' It is believed that some expense would have been saved if the sheriff had not been at the scene of the gathering of all those weapons,"

and at the end of this article in black face type it printed the following:

"Eyewitness Saw Lon Larson Shot And Killed By A Man Identified By The Sheriff As Hiram BeBee. Why Wait?"

And in another article in this same newspaper describing the funeral services for the deceased at which there was a large attendance, it printed the following:

"President S. M. Nielson spoke of the responsibilities carried by Lon and paid high tribute to his character and then he chided society for opening the way for 'such degraded trash' to come into our midst and live among respectable people, as did these depraved and degraded outlaws, who struck down this good man. He said the government appropriates funds to destroy predatory animals and little or nothing is done to destroy such demons as those who kill law abiding citizens without cause."

The sheriff and the newspapers filed counter-affidavits to defendant's affidavits in support of his motion for a change of venue. The sheriff denied that he removed the defendant to the Salt Lake County jail for safety, but stated that he did so because of the lack of facilities for feeding prisoners in San Pete County it was cheaper to board them in Salt Lake. The newspapers in their affidavits denied that the articles printed represented the views or

reactions of the people of San Pete County, but said they were based on interviews of witnesses and officials investigating the crime.

It is well settled that it lies within the sound discretion of the trial court to determine whether a change of venue should be granted on the ground that a fair and impartial trial cannot be had in the county in which the offense has been committed, and this court will not disturb the decision unless an abuse of discretion is shown. *State* v. *Haworth,* 24 Utah 398, 68 P. 155; *State* v. *Carrington,* 15 Utah 480, 50 P. 526; *State* v. *Cano,* 64 Utah 87, 228 P. 563; *State* v. *Kukis,* 65 Utah 362, 237 P. 476.

Did the court abuse its discretion in refusing to grant a change of venue in view of the fact that the newspaper articles, which according to the publishers contained facts based on eyewitness accounts and official investigations confirmed defendant's allegation that there had been mob activity and a great feeling of resentment aroused in the county against him at the time of his arrest?

Threats of mob action may be sufficient to show that the feeling against a defendant in the county is so intense that it would not be possible to obtain a fair and impartial trial; however, whether mob violence is of such a nature as to indicate a feeling which permeates the entire community and which would make it impossible to secure an unprejudiced jury and procure a fair and impartial trial depends upon the circumstances in each individual case. As stated in 22 C. J. S., Criminal Law, § 196, subsec. 3, page 315:

"Threats and danger of personal harm to accused, and actual attempts to mob and kill him, will not necessarily indicate that a jury cannot be obtained which will accord a fair and impartial trial, so as to require a change of venue. * * *"

If at the time of trial there are no disturbances and it appears that it will be possible to obtain a jury which will render a verdict regardless of public opinion, it is not an

abuse of discretion for the court to refuse to grant a change of venue, even though at one time before trial there had been such violent feeling and prejudice against the defendant that mob action was threatened. *People* v. *Yeager,* 194 Cal. 452, 229 P. 40; *Owens* v. *State,* 215 Ala. 42, 109 So. 109; *State* v. *Roberson,* 159 La. 562, 105 So. 621. In the instant case no great difficulty was encountered in obtaining a jury. The defendant challenged for cause only five prospective jurymen, four of whom were excused and one retained, and whose retention has been assigned as error by defendant and upon which we shall comment hereafter. There were no disorderly or violent scenes in the courtroom at the time of trial, and the trial proceeded in an orderly manner without manifestation of prejudice against defendant from any spectators. Under such circumstances this court will not say that the trial court abused its discretion in refusing to grant a change of venue. However, it certainly would not have been error for the court to have granted a change of venue and we are of the opinion that it would have been better if the trial court had granted the change under the circumstances of this case where there were inflammatory newspaper comments; suggestive remarks of a church official quoted in the paper; the gathering of an armed mob; a comparatively small community, no doubt closely knit by church affiliations; a deceased well known to the community, popular, and having many friends and relatives throughout the county; and an obviously eccentric old man as an accused whose penchant for rhetorical showmanship repulses what little tolerance might otherwise have been accorded him. In murder cases the law does not, whether rightly or wrongly, weigh the relative quality of the human being who kills with the one who was killed. The only question is as to whether the crime charged has been committed by the defendant. While it is too much to expect of human nature that those factors will not in some measures influence their deliberations, when there is a probability that such factors will be given undue consideration or that bias will creep in because

of this factor it would be well for the trial judge to remove the trial of the case to a place far enough away where such influence would be a negligible factor if present at all.

Defendant assigns as error the retention on the jury panel of one of the juors he challenged for cause. This juryman on his voir dire stated that he had formed an opinion in the case based on newspaper articles and rumors which it would take evidence to remove. After considerable examination he stated that he could set this opinion aside, follow the court's instructions, and base his verdict on the evidence presented in the case and render a fair and impartial verdict.

Sec. 105-31-19, U. C. A. 1943, provides that a juror may be challenged for implied bias for:

"(8) Having formed or expressed an unqualified opinion or belief as to whether the defendant is guilty or not guilty of the offense charged."

This court has interpreted this in accordance with Sec. 105-31-21 to mean that even if a juror has formed an opinion based on rumors and newspaper articles, but he can nevertheless set that opinion aside and be fair and impartial and give a verdict in accordance with the evidence adduced at the trial, the court may determine that he is qualified to act and this court will not disturb its decision since it was in a better position to ascertain whether or not the juror was actually biased. *People* v. *O'Loughlin*, 3 Utah 133, 1 P. 653. See also *State* v. *Thorne*, 41 Utah 414, 126 P. 286, Ann. Cas. 1915D, 90; *State* v. *De Weese*, 51 Utah 515, 172 P. 290 on the question of challenge for cause for bias of juror. We hold the court did not commit error in allowing that juror to serve.

During the closing argument to the jury the special prosecutor referred to defendant as an "accomplished fence" and explained that a "fence" is a "fellow who goes around and hunts up the soft places and gets ready for the boys who follow who know how to use the powder."

This remark was objected to by the defense and assigned as error. The judge told the jury that the statement of the special prosecutor was not evidence, but that he had a right to make such deduction as he thought was reasonable from the evidence. Evidence had been introduced that defendant had been previously convicted of a felony, however, there was no evidence as to what this felony was, and there was no evidence whatsoever from which it could be reasonably inferred that defendant was a "fence" either as that term is usually understood or as counsel explained it meant.

Under the facts and circumstances of this case where the defendant has shot a marshal who has evicted him from a tavern for no more apparent reason than that he did not like the manners of defendant, such a remark might well be a determining factor in a juror's mind as to the degree of murder of which defendant is guilty or on the question of making recommendations. A jury might be misled to believe in view of the fact that there was evidence that defendant had been previously convicted of a felony that the offense of which he was convicted was that of being a "fence" as defined by special prosecutor and that the marshal knew that he was such and for that reason acted in the manner in which he did rather than for the reasons adduced by the evidence, especially in view of the judge's remark that the prosecutor had a right to make reasonable deductions from the evidence. Obviously counsel's remark could have been made for no other purpose than to prejudice the jury since there was no evidence whatsoever that defendant was a "fence" either in the commonly understood meaning of that term or as defined by him. This is a capital case and in such a case this court will not say that a remark which was made for the purpose of prejudicing a jury failed of its intended effect and did not influence the jury in its verdict under the facts and circumstances disclosed in this case. This was prejudicial and reversible error.

Defendant further assigns as errors the court's failure to dismiss the case at the end of the state's evidence and its refusal to direct a verdict of not guilty at the conclusion of

the taking of all the evidence and also its refusal to take from the deliberation of the jury the question of guilt of either first or second degree murder.

Defendant contends that the court erred in not granting these motions because the evidence adduced at the trial both for the state and defense established as a matter of law that the killing was done in self-defense, and the state failed to prove facts sufficient to submit to a jury the question of defendant's guilt either of first or second degree murder. We have carefully examined the record and cannot agree with these contentions. Defendant sought to prove that he was acting in self-defense but the evidence was such that a jury could reasonably conclude that the killing was deliberate and intentional, especially since sufficient time had elapsed for the deceased to turn and leave the defendant and the truck and start a conversation with defendant's wife before the first shot was fired. Under all the circumstances of the case as outlined by the evidence the jury could reasonably conclude that the killing was done in a spirit of vengeance and after premeditation rather than self-defense.

Defendant assigns as error the giving by the court of that portion of instruction No. 5 which told the jury:

"* * * All persons are of sound mind who are neither idiots, nor lunatics, nor affected with insanity."

"Every sane man is presumed to intend the natural and probable consequences of an act which he intentionally performs. In other words, every person is presumed to intend that which his acts indicate his intention to have been."

"The defendant in this case is conclusively presumed by the law to have been sane at the time of the alleged commission of the offense charged."

There was no issue of insanity in this case and in view of certain personal characteristics of the defendant the jury might have been misled by the court's instruction that he was conclusively presumed to be sane and therefore guilty without carefully considering the question of his intentions at the time of the shooting. It is

therefore our opinion that under such circumstances it would have been better not to have instructed the jury that the defendant was presumed to be sane.

In instruction No. 27, which defendant also assigns as error the court told the jury:

"Evidence was elicited from the defendant that he had prior hereto been convicted of a felony and that he had gone under different names during his lifetime. You are instructed that such evidence should be considered by you as going to the credibility of the defendant as a witness in his own behalf."

The court was correct in that part of this instruction which told the jury that it should take into consideration as going to his credibility the fact that defendant has been convicted of a felony but it erred when it also instructed the jury that his going under various assumed names should also be considered for that purpose. While the court did not expressly so instruct the jury there was an implication in that instruction that the fact that he went under assumed names has a tendency to impeach the veracity of the defendant. Assumed names are so commonly used for legitimate business and other purposes that such fact in and of itself does not have such a tendency.

Defendant assigned as error the giving of other instructions to the jury and the failure to give instructions requested by him. Suffice it to say that we have carefully read and considered all of these assignments of error and find no merit to any of them. Since this case must be sent back for a new trial, we call attention to what was said in *State* v. *Thompson,* 110 Utah 113, 170 P. 2d 153, on the giving of general abstract instructions where we emphasize that the court should apply the law to the facts of the case as they appear in the evidence and suggest that on the retrial the instructions may be improved by following the ideas expressed therein.

Reversed and remanded for new trial.

LARSON, C. J., and McDONOUGH, PRATT, and WOLFE, JJ., concur.