STATE of Utah, Plaintiff and Appellee,

v.

Steven Ray JAMES, Defendant and Appellant.

No. 870306.

Supreme Court of Utah.

Jan. 6, 1989.

Robert W. Gutke and Nathan D. Hult, Logan, for defendant and appellant.

R. Paul Van Dam and Sandra L. Sjogren, Salt Lake City, for plaintiff and appellee.

HOWE, Associate Chief Justice:

On petition of defendant Steven Ray James, which he filed pursuant to Utah Code Ann. § 77–35–26(2)(c) (1982, Supp. 1988), we granted this interlocutory appeal from certain pretrial orders in the instant case in which defendant is charged with first degree murder. He claims two errors: (1) that the trial court abused its discretion in denying his motion for a change of venue; and (2) that his right to a fair trial will be jeopardized by the use of a prior conviction as an aggravating circumstance to be proved in the guilt phase of his trial.

On August 26, 1986, defendant reported that his infant son, Steven Roy James, was missing from a parked car in which he had left him in a store's parking lot in Logan, Utah. Extensive news media coverage began immediately. Some of this news coverage was in connection with information disseminated by the Logan Police Department. Other coverage was in connection with efforts to find the missing child, spearheaded by a local volunteer committee organized for that purpose. Additional coverage was of direct contacts by reporters with the parents of the infant.

On October 11, 1986, the remains of an infant, later identified as Steven Roy James, were found in Cache County, submerged in an area known as the Benson Marina, by a group of duck hunters. The remains had begun to decompose, and identification was made through forensic evidence concerning the infant's hair, footprints and handprints, and identification of the clothing and blanket in which the body was wrapped as being similar to clothing and a blanket belonging to the baby. The

actual cause of death was undetermined but listed as a homicide by the state medical examiner. There was no objective evidence, however, as to the cause of death.

Defendant was charged with first degree murder, a capital offense, pursuant to Utah Code Ann. § 76–5–202(1)(h) (1978, Supp. 1988). The charge alleged that he intentionally or knowingly caused the death of Steven Roy James and alleged as an aggravating circumstance that defendant had previously been convicted of a felony involving the use or threat of violence to a person. Discovery disclosed that defendant was convicted in 1973 in the state of California of the crime of false imprisonment, which the prosecution argues is a felony involving the use or threat of violence to a person. He allegedly pleaded guilty to false imprisonment pursuant to a plea negotiation in which a charge of kidnapping was dismissed.

## CHANGE OF VENUE

Defendant moved for but was denied a change of venue. He argues that the extensive pretrial publicity and the unique circumstances of widespread community involvement in Cache County, a relatively small and homogeneous geographical area, to find the missing child make it extremely difficult for him to obtain a fair trial. Thus, he contends the denial of his motion was an abuse of discretion. The constitutions of Utah and of the United States both guarantee a defendant the right of trial by an impartial jury. Utah Const. art. I, § 12; U.S. Const. amend. VI. This right has been implemented by Utah Code Ann. § 77–35–29(e)(i) and (ii) (1982, Supp.1988), which provides:

(i) If the prosecution or a defendant in a criminal action believes that a fair and impartial trial cannot be had in the jurisdiction where the action is pending, either may, by motion, supported by an affidavit setting forth the facts, ask to have the trial of the case transferred to another jurisdiction.

(ii) If the court is satisfied that the representations made in the affidavit are true and justify transfer of the case, the court shall enter an order for the removal of the case to the court of another jurisdiction free from the objection and all records pertaining to the case shall be transferred forthwith to the court in the other county. If the court is not satisfied that the representations so made justify transfer of the case, the court shall either enter an order denying the transfer or order a formal hearing in court to resolve the matter and receive further evidence with respect to the alleged prejudice.

*See* Utah R.Crim.P. 29(e)(i), (ii).

■ Although the statute speaks in terms of the trial court's being "satisfied" that the representations made in the affidavit are true and justify transfer of the case, this Court has apparently never defined the term "satisfied." We note that this term has been employed in our change of venue statute since at least 1888. *See* 2 Comp. Laws of Utah § 4992 (1888). In the long line of cases which have come to this Court beginning with *State v. Carrington,* 15 Utah 480, 50 P. 526 (1897), we have held that it lies within the sound discretion of the trial court to determine if a change of venue should be granted on the ground that a fair and impartial trial cannot be had in the county in which the offense has been committed, and this Court will not disturb that decision unless an abuse of discretion is shown. We have in every case which has come to this Court found no abuse of discretion in the denial of a change of venue by the trial court. Only in *State v. BeBee,* 110 Utah 484, 491, 175 P.2d 478, 481 (1946), did we go so far as to say that "it certainly would not have been error for the court to have granted a change of venue and we are of the opinion that it would have been better if the trial court had granted the change under the circumstances...." The circumstances of that case which prompted that strong statement from this Court were

inflammatory newspaper comments; suggestive remarks of a church official quoted in the paper; the gathering of an armed mob; a comparatively small community, no doubt closely knit by church

affiliations; a deceased well known to the community, popular, and having many friends and relatives throughout the county; and an obviously eccentric old man as an accused whose penchant for rhetorical showmanship repulses what little tolerance might otherwise have been accorded him.

*BeBee,* 110 Utah at 491, 175 P.2d at 481–82. In every other case decided by this Court on this subject, we have simply held that the denial of a change of venue was not an abuse of discretion and that the showing made by the defendant in support of his motion was inadequate. But we have never defined or attempted to indicate other than our expression in *State v. BeBee,* quoted above, what would be an adequate showing. Even in that case, however, we did not hold that the denial was an abuse of discretion, although we did state that "it would have been better" if the change of venue had been granted.

▇ Although the term "satisfied" is often used in the law to mean something akin to a conviction or belief beyond a reasonable doubt, in the context of change of venue, the term should not be given that meaning. In *State v. BeBee,* in dictum we indicated that "where there is a probability" that pretrial publicity and prejudice will be given undue consideration or that bias will creep in because of these factors, it would be well for the trial judge to remove the trial to a place far enough away where such influence would be a negligible factor if present at all. Later, in *State v. Wood,* 648 P.2d 71, 88–89 (Utah 1982), we stated that the affidavit of defense counsel and a newspaper article regarding the victim's father fell far short of demonstrating that there was such a tainted community attitude that a fair and impartial trial was "not likely." In an attempt to more definitely define the standard to be followed by the trial judge in considering a motion for a change of venue, we conclude that the judge should grant the motion whenever he or she finds a reasonable likelihood that a fair trial cannot be had unless the motion is granted. This is the rule fashioned by the Supreme Court of California in *Maine v. Superior Court,* 68 Cal.2d 375, 438 P.2d

372, 66 Cal.Rptr. 724 (1968), taking its cue from language used in *Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). In a later case, *Frazier v. Superior Court of Santa Cruz County,* 5 Cal.3d 287, 486 P.2d 694, 95 Cal.Rptr. 798 (1971), the California court explained that a reasonable likelihood of prejudice does not mean that the prejudice must be more probable than not. In summary, although section 77–35–29(e)(ii) employs language to the effect that the trial court should be "satisfied" that a fair and impartial trial cannot be had in the jurisdiction where the action is pending, the burden on the defendant should be understood to be that he must raise a "reasonable likelihood" that such a trial cannot be afforded him.

▇ We now examine the record in an attempt to isolate the factors which have been considered criteria of the potential for prejudice from pretrial publicity. Factors to be considered include (1) the standing of the victim and the accused in the community; (2) the size of the community; (3) the nature and gravity of the offense; and (4) the nature and extent of publicity. *Martinez v. Superior Court of Placer County,* 29 Cal.3d 574, 629 P.2d 502, 174 Cal.Rptr. 701 (1981). We will discuss the impact of these factors in the instant case, bearing in mind that we take the totality of the circumstances into account. *State v. Pierre,* 572 P.2d 1338, 1350 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978).

*Standing of Accused and Victim in Community*

Defendant and the victim's mother had lived together in Logan for only two weeks prior to the infant's disappearance. They were not married. Defendant has relatively long hair and at an earlier time wore a stud in one ear. At his preliminary hearing, there was testimony that he had been using drugs shortly before the child disappeared. All of this tends to depict him as being different from most residents in Cache County. The victim was three

months old at the time of his disappearance.

### Size of the Community

Logan, where the child lived at the time of his disappearance, is the county seat of Cache County and in 1986 had an estimated population of 28,880. Cache County has an estimated population of 69,200.

"[T]he smaller the community, the more likely there will be a need for a change of venue in any event when a heinous crime is committed." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 599–600 n. 22, 96 S.Ct. 2791, 2822 n. 22, 49 L.Ed.2d 683 (1976) (Brennan, J., concurring in the judgment). A populous metropolitan community will decrease the need for a change of venue. *People v. Harris,* 28 Cal.3d 935, 623 P.2d 240, 171 Cal.Rptr. 679, *cert. denied,* 454 U.S. 882, 102 S.Ct. 365, 70 L.Ed.2d 192 (1981); *People v. Manson,* 61 Cal.App.3d 102, 190, 132 Cal.Rptr. 265, 318 (1976), *cert. denied,* 430 U.S. 986, 97 S.Ct. 1686, 52 L.Ed.2d 382 (1977) (refusal to move trial from Los Angeles area). In a small town, a major crime is likely to be embedded in the public consciousness with greater effect and for a longer time than it would be in a large, metropolitan area. *Martinez v. Superior Court of Placer County.*

In the instant case, not only are we concerned with a small city and a small county, but during the month and one-half that the child was missing, there was a widespread community effort to help locate the missing child. The community's efforts were organized and directed by the wife of the bishop of a local ward of the city's predominant church. The ward's church building was used as the center for the volunteer activity. In addition to eighty-six adult volunteers, offers of assistance came from three Girl Scout groups, a high school journalism class, the local relief societies of the predominant church, an Assembly of God church, and various local businesses. An appeal was made to school children of the community for envelopes and stamps for the purpose of sending out flyers. Thousands of flyers, posters, and envelopes were printed. The paper and the printing labor were donated. Sixteen thousand flyers were mailed out by Medmaster. Preparations were made for a nationwide effort to find the baby. Phones were donated, and pictures were printed by a grocery chain on grocery bags and distributed to 600 stores. A fast food restaurant printed thousands of tray place mats with the infant's picture. Besides the large contributions in material, labor, and postage, cash contributions exceeded $1,700. Much of that money was collected through small donations dropped into bottles which had been placed in grocery stores. One business in Logan loaned typewriters to the volunteers. Another business sent flyers out to all their employees. Photographic materials and labor were donated in preparing photos of the missing child. Other businesses donated office supplies to assist the volunteers. A public utility supplying natural gas in an area spreading over three states, including Cache County, printed 500,000 copies of the story of the child's disappearance and mailed them with its monthly statements. Several fast food businesses provided lunches for the volunteers.

The chairwoman of the volunteer committee testified that most of the volunteers "had some degree of emotional involvement in what they were doing" and, after the child's body was found and defendant had been charged with the killing, that she heard a news report that some of the volunteers "felt they had been a bit gullible." She denied that any volunteer had made that comment to her, but admitted that many people had expressed opinions to her concerning defendant's guilt or innocence. She testified, however, that she personally was content to presume him innocent until he had been proved guilty.

### Nature and Gravity of the Offense

The body of the three-month-old infant was found submerged in a river and weighted down with rocks. Defendant is charged with the intentional killing of his child, first degree murder, a capital offense which could be punishable by death.

*Nature and Extent of Publicity*

The disappearance of the child, the search effort, and the discovery of the child's body a month and one-half later generated extensive media coverage. Some of it was in connection with information disseminated by the Logan Police Department. Other coverage was in connection with efforts to find the missing child, spearheaded by the volunteer committee. Additional news stories came from direct contacts by reporters with the parents of the infant. The three television stations in Salt Lake City which can be viewed in Cache County covered the events as follows: Television station KUTV, channel 2, carried eighty-four news items on thirty-four different days; KTVX, channel 4, carried thirty-six news items on twenty-five different days; KSL, channel 5, carried thirty-eight news items on twenty-five different days.

Newspaper coverage included forty-five news articles on forty-two different days in *The Herald Journal,* Logan's daily newspaper. *The Cache Citizen,* a Cache Valley weekly newspaper, published five feature articles. Moreover, two local radio stations carried numerous accounts of the events.

Not only was the media coverage extensive, some of it also carried implications and innuendos of defendant's complicity in the child's disappearance. References were made to defendant's becoming "uncooperative," that he "was always the key suspect," and that he "persistently denied involvement." Contrast was drawn between his tears and the "real ones" belonging to one of the volunteers. The statement was made that he "acted every inch the grieving father." It was further reported that "he even threatened to kill the detective who cracked the case." Moreover, some of the information disseminated by the police was equally troublesome, viz., that defendant had become uncooperative, that police wanted answers, that details related him to a California abduction at knifepoint and a police investigation of a California child abuse case where an infant sustained severe injuries, that the child's mother had passed a polygraph but that defendant twice refused to take one, that defendant was hostile to police, and that he was always the key suspect.

*Analysis and Conclusion*

The evidence on the foregoing four factors weighs in favor of granting a change of venue. Defendant, being a newcomer to Logan and having a lifestyle quite different from most of its residents, suffers from a lack of standing in the community. The victim was a helpless, innocent baby. Logan and Cache County are small, which weighs against defendant. Defendant stands charged with first degree murder, the only criminal offense in Utah which may be punishable by death. Because of the lapse of a month and one-half between the time the child disappeared and the time his body was found submerged in a river, extensive news coverage was made of the disappearance, the search efforts, and the discovery of the body. Defendant was always a suspect because of his past record, and this fact was mentioned with others which cast suspicion upon him from the very start.

While all of these facts weigh in favor of changing venue, we believe that there is in this case another factor which clinches our belief that a reasonable likelihood exists that defendant cannot receive a fair and impartial trial in Cache County. Unlike any case which has come before this Court where it has been contended that a change of venue should have been granted, in the instant case there was a widespread community effort to locate the missing child. This effort touched many adults, schoolchildren, and businesses. They responded with money, material, and countless hours of labor. This community involvement brought many people much closer to this alleged crime than ordinarily occurs. One television news story reported that the events had "touched the community at its very core"; another news release quoted a Logan resident as saying, "We're all taking this very personally. It's as though someone has violated our homes ... our families." In *State v. Wood,* 648 P.2d 71 (Utah 1982), *State v. Pierre,* 572 P.2d 1338 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct.

219, 58 L.Ed.2d 194 (1978), *State v. Lafferty,* 749 P.2d 1239 (Utah 1988), and *State v. Bishop,* 753 P.2d 439 (Utah 1988), all recent capital murder cases in which we held that the trial court had not abused its discretion in denying motions for change of venue even though the crime in each case was heinous and aroused many of the populace, there was no community involvement. We believe this involvement gives the instant case a very different dimension and accentuates the difficulty in seating a jury which has not been touched in some way, either directly or through family or friends, with this crime, which played a prominent part in the lives of Cache County residents for a month and one-half.

The trial judge, in denying the motion for a change of venue, commented that "the easiest thing" for him to do would be to grant the motion, but that even though information prejudicial to defendant had been disseminated through the media, he did not find that its impact had been so great that he could not find twelve jurors in Cache County who could try the case without bias or prejudice against defendant. He cited the testimony of the chairwoman of the volunteers, who stated that although she had been heavily involved in the search for the child, she had no opinion as to defendant's guilt or innocence and would presume him to be innocent until proved guilty. We do not doubt the sincerity of the conclusion of the trial judge, nor do we question the integrity of the chairwoman's testimony. Jurors are commonly seated to hear felony trials after they have stated that despite hearing prejudicial information about the defendant and perhaps even having formulated some opinion as to guilt, they would be able to set aside any preconceived notions and decide the case on the evidence presented at trial. This Court has upheld on appeal attacks against many jury verdicts rendered under such circumstances. *See State v. Lafferty* and cases cited therein. We believe, however, that the instant case presents a set of circumstances not usually found in criminal cases. Here, the impact of the alleged crime reached deeply into the community. Not only were residents exposed to media infor-

mation on almost a daily basis, but also many adults and children assisted in one way or another in the month and one-half search effort. Although we do not doubt that twelve persons could be found who could honestly promise to set aside any prejudicial information which they had heard and any preconceived notions which they had formed, there are limits to what should reasonably be asked and expected of prospective jurors who have been exposed to the events surrounding the alleged crime. See *State v. Jones,* 734 P.2d 473 (Utah 1987), where we reversed the trial court's denial of a challenge for cause made by the defendant against two jurors who were closely associated with members of the victim's family, but who, when pressed, stated that they would base their decision on the evidence and follow the law as instructed upon.

Defendant's right to a fair and impartial trial need not be exposed to the risks which would attend the calling of the jury from Cache County. This is a capital case. Not only will a jury be required to determine the guilt or innocence of defendant, but if guilt is found, the jury will probably be urged by the prosecution to impose the death penalty. In deciding whether to impose the death penalty, the jury must weigh aggravating circumstances against mitigating circumstances. This is the most momentous judgment a jury can be asked to make. The judgment should be made in an atmosphere as free from any taint of bias or prejudice as is reasonably possible. Because of the unique circumstances of this case, it would not be fair or wise to either defendant or the residents of Cache County to require a Cache County jury to make that decision.

Unlike any of the other cases coming before this Court where the trial court has denied a motion for a change of venue, this case has not yet been tried. This circumstance affords us the opportunity to review the denial before any error committed would be prejudicial to defendant. We are in accord with a statement made by the Supreme Court of the United States in *Sheppard v. Maxwell,* 384 U.S. 333, 363, 86

S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966), that "reversals are but palliatives" and that "the cure lies in those remedial measures that will prevent the prejudice at its inception." Later, the California court in *Martinez v. Superior Court of Placer County* expressed the same sentiment:

> Neither an accused whose life hangs in the balance nor the authorities charged with enforcing and administering the law should be required to face the possibility of a second trial when, as here, we face acute dangers to an impartial trial and when we can avoid them by the simple expedience of a change of venue.

*Martinez*, 629 P.2d at 508, 174 Cal.Rptr. at 707.

In summary, the trial court abused its discretion in denying the motion for a change of venue. Judicial economy will be served by now reversing the order denying the motion and granting the motion. The trial can then go forward in another county where a jury can be selected free from any taint of prejudice, and if a jury should convict defendant, its verdict would not be vulnerable to attack for community bias and hostility. This Court will then be spared the difficulty it encountered in *State v. BeBee*, where we were of the opinion that "it would have been better if the trial court had granted the change under the circumstances of this case" but struggled to affirm the conviction in spite of that opinion.

### ADMISSION OF DEFENDANT'S PRIOR CRIMINAL RECORD

Defendant is charged with murder in the first degree, in violation of Utah Code Ann. § 76–5–202(1)(h) (1978, Supp.1988). That section provides:

> (1) Criminal homicide constitutes murder in the first degree if the actor intentionally or knowingly causes the death of another under any of the following circumstances:
>
> . . . .
>
> (h) The actor was previously convicted of first or second degree murder *or of a felony involving the use or threat of violence to a person.*

(Emphasis added.) It is alleged that he intentionally or knowingly caused the death of his son and that he had been previously convicted of a felony involving the use or threat of violence to a person. Defendant complains that reading to a jury that he allegedly had been earlier convicted of a felony as part of the charging information before presentation of any evidence will be prejudicial because of the tendency of the jury to convict because he is a "bad person" rather than because he has been proved guilty of capital homicide.

In other contexts, the legislature has recognized the prejudicial impact of presenting prior convictions of a defendant before a jury and has taken necessary precautions to insure that such prejudice based upon a defendant's "status" as a previously convicted felon will not taint a jury's factfinding task. Our habitual criminal statute, Utah Code Ann. § 76–8–1002(2), (3) (1978) provides:

> (2) If the defendant is bound over to the district court for trial, the county attorney shall in the information or complaint set forth the felony committed within the state of Utah and the two or more previous felony convictions relied upon for the charge of being—a habitual criminal. If a jury is impaneled, it shall not be told of the previous felony convictions or charge of being a habitual criminal. The trial on the felony committed within the state of Utah shall proceed as in other cases.
>
> (3) If the court or jury finds the defendant guilty of the felony charged, then the defendant shall be tried immediately by the same judge and jury, if a jury was impaneled, on the charge of being a habitual criminal, unless the defendant has entered or enters a plea of guilty to the charge of being a habitual criminal.

■ Thus, the court is prohibited from reading a habitual criminal charge to a jury before guilt on the substantive offense is determined. Only if a verdict of guilty is returned can the jury, in a bifurcated proceeding, be presented evidence of past convictions. See *State v. Saunders*, 699 P.2d

738 (Utah 1985), where we held it was an abuse of discretion for a trial court to deny a timely filed motion by a criminal defendant to separately try him on burglary and theft charges from a charge that he unlawfully possessed a firearm while he was a prison inmate housed in a halfway house. Utah Code Ann. § 76–10–503(2) (1978, Supp.1988). The basis of our decision was to avoid any tendency on the part of the fact finder to convict him of burglary and theft because of the prior crime for which he was incarcerated. We affirm that evidence of prior crimes is generally presumed prejudicial and that "absent a reason for the admission of the evidence other than to show criminal disposition, the evidence is excluded." *Saunders*, 699 P.2d at 741.

In order to avoid prejudice to the defendant in the instant case while the jury is deciding his guilt of the offense charged, we exercise our inherent supervisory power over trial courts and adopt the bifurcated approach advanced in *State v. Bishop*, 753 P.2d 439, 498 (Utah 1988) (Zimmerman, J., concurring in the result), and apply it to section 76–5–202(1)(h). The jury is not initially to be presented with mention or evidence of defendant's prior conviction. If the jury finds him guilty of an intentional and knowing killing, it may then be instructed on the prior conviction if the trial court determines that it qualifies under section 76–5–202(1)(h). The jury should then return to deliberate the existence or nonexistence of the prior conviction, which will, in turn, determine whether the homicide is first or second degree murder. "It is especially appropriate that we exercise that supervisory power to require certain procedures when fundamental values are threatened by other modes of proceeding." *Bishop*, 753 P.2d at 499. Justice Zimmerman wrote:

> The legitimate interests of the state and the accused can easily be accommodated through a bifurcated procedure. When the underlying crime is charged, and enhancing circumstances involving other crimes or bad acts factually related to the underlying criminal episode are also charged for the purpose of increasing the severity of the punishment for the underlying crime, the trial court must divide the trial into separate segments. First, evidence regarding the underlying crime should be admitted, and the jury should be asked to determine guilt or innocence based on that evidence alone. Second, if a guilty verdict is returned on the underlying charge, then evidence regarding the enhancing circumstances should be heard by the same jury for the purpose of determining whether those circumstances have been proven beyond a reasonable doubt.

*Bishop*, 753 P.2d at 498.

We reverse the order denying defendant's motion for a change of venue and grant the same. The trial court is directed to remove the case to another county "free from the objection" in accordance with section 77–35–29(e)(ii). There, the trial of defendant shall proceed in accordance with this opinion.

HALL, C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.